Rigoberto AVILA, Jr., TDCJ
No. 999391, Petitioner,

v.

Nathaniel QUARTERMAN, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.

Civil No. EP–04–CA–419–FM.

United States District Court,
W.D. Texas,
El Paso Division.

July 13, 2007.

Chris K. Gober, Nicholas & Barrera, J. Scott Sullivan, Attorney at Law, San Antonio, TX, Robin Norris, El Paso, TX, for Petitioner.

Thomas M. Jones, Assistant Attorney General, Austin, TX, for Respondent.

### MEMORANDUM OPINION AND ORDER

MONTALVO, District Judge.

Petitioner Rigoberto Avila, Jr. filed this federal habeas corpus action pursuant to Title 28, United States Code, section 2254, collaterally attacking his otherwise final, May, 2001, El Paso County conviction for capital murder and sentence of death. For the reasons set forth in detail below, petitioner is entitled to partial federal habeas corpus relief regarding his sentencing but not entitled to federal habeas corpus relief regarding his conviction. Moreover, petitioner is entitled to a Certificate of Appealability on two of his claims.

## TABLE OF CONTENTS

## TABLE OF CONTENTS

I. **Statement of the Case** ................................................720
 A. Factual Background ................................................720
 1. The Events of February 29, 2000 ................................721
 2. Surgical Efforts to Save Nicolas................................722
 3. The Severity of Nicolas' Injuries ................................722
 4. Petitioner's First Police Interview ................................722
 5. Petitioner's Second Police Interview ................................722
 B. Indictment................................................722
 C. Guilt–Innocence Phase of Trial ................................................722
 1. The Prosecution's Case ................................................722
 2. The Defense's Evidence................................................723
 3. The Verdict ................................................725
 D. Punishment Phase of Trial................................................725
 1. The Prosecution's Evidence ................................................725
 2. The Defense's Evidence................................................725

 3. Verdict ...................................................726
 E. Direct Appeal .............................................726
 F. State Habeas Corpus Proceeding ...........................726
 G. Procedural History in this Court...........................727
II. ***AEDPA Standard of Review*** ................................727

III. ***Evidence of Good Character in the Texas Capital Sentencing Scheme*** .........729
 A. The Claim ...............................................729
 B. State Court Disposition....................................729
 C. AEDPA Review ...........................................729
 1. Clearly Established Federal Law.......................729
 2. The Punishment Phase of Petitioner's Trial ...........730
 3. Synthesis ..........................................730
 4. Conclusion .........................................732

IV. ***Ring v. Arizona and Apprendi v. New Jersey Claim***.........................732
 A. The Claim ...............................................732
 B. State Court Disposition....................................733
 C. AEDPA Review ...........................................733
 1. Clearly Established Federal Law.......................733
 2. Punishment Phase of Petitioner's Trial ...............734
 3. Synthesis ..........................................734
 4. Conclusion .........................................739

V. ***Brady Claim***...........................................................739
 A. The Claim ...............................................739
 B. State Court Disposition....................................739
 1. Pretrial Proceedings.................................739
 2. Petitioner's Trial...................................739
 3. Petitioner's State Habeas Proceeding .................740
 C. AEDPA Review ...........................................743
 1. Clearly Established Federal Law.......................743
 2. State Habeas Court's Faulty Factual Findings and Erroneous Legal Conclusions Regarding the Suppression and Favorable Nature of Dr. Wilson's Opinions ...................................744
 a. Dr. Wilson Actually Assisted the Prosecution ....................745
 b. Prosecutors' Personal Knowledge Irrelevant ......................748
 c. Prosecutors' Good Faith Irrelevant .............................748
 d. Petitioner Had No Notice of Dr. Wilson's Opinions.................749
 (1) Dr. Wilson Had Not Yet Concluded Anything Regarding the Cause of Nicolas' Death at the Time of the Second Autopsy .........................................749
 (2) Dr. Wilson's Opinions Were Neither Cumulative nor Duplicative of Dr. Rodriguez's Opinions .....................751
 (3) Nothing in Dr. Wilson's Surgical Report Alerted the Defense to Any of Dr. Wilson's Opinions Regarding the Cause of Nicolas' Death or Dr. Wilson's Other Opinions.....752
 3. Synthesis ..........................................754
 a. Dr. Wilson's Suppressed Opinions were Favorable to the Defense .........................................754
 b. Materiality .......................................754
 (1) The Issues before this Court .........................754
 (2) Guilt–Innocence Phase of Trial.......................755
 (3) Punishment Phase of Trial ..........................757
 4. Conclusions ........................................759

VI. ***Ineffective Assistance by Trial Counsel*** ....................................759
 A. The Claim ...............................................759
 B. State Court Disposition....................................759

C. AEDPA Review ...........................................760
 1. The Federal Constitutional Standard of Review ......................760
 2. Synthesis ...........................................761
 a. The Issues Before this Court ...............................761
 b. Guilt–Innocence Phase of Trial ................................761
 (1) Arguably No Prejudice .......................................761
 (2) No Deficient Performance........................................762
 c. Punishment Phase of Trial........................................763
 (1) Prejudice Established .........................................763
 (2) Arguably No Deficient Performance ...........................763
 3. Conclusions .........................................765

VII. *Ineffective Assistance by Appellate Counsel* .............................765
 A. The Claim ...........................................765
 B. State Court Disposition...........................................765
 C. AEDPA Review .........................................766
 1. The Federal Constitutional Standard of Review ......................766
 2. Synthesis .........................................767
 a. No Prejudice ...........................................767
 b. No Deficient Performance .........................................767
 3. Conclusion .........................................768

VIII. *Request for Evidentiary Hearing* .........................................768

IX. *Certificate of Appealability* .............................................770

X. *Orders* ...............................................774

### I. *Statement of the Case*

#### A. *Factual Background*

##### 1. *The Events of February 29, 2000*

The relevant facts surrounding petitioner's offense are not in genuine dispute. Around six p.m. on the evening of February 29, 2000, Marcelina Macias left her four-year-old son Dylan and her 19–month–old son Nicolas in the care of the petitioner.[1] Around 6:50 p.m., petitioner paged Marcelina.[2] At 7:02 p.m., petitioner placed a 911 call and advised the operator who answered that Nicolas was not breathing.[3]

Paramedics arrived at the Macias home minutes later and found petitioner, still talking on the phone, kneeling over Nicolas.[4] The petitioner advised them Nicolas had stopped breathing within fifteen-to-twenty minutes of their arrival and that the older child had placed his hand over Nicolas' mouth while they were playing.[5] The paramedics quickly observed Nicolas was unconscious and unresponsive, not breathing, and had no pulse.[6] They began efforts to resuscitate Nicolas, injecting epi-

---

1. Statement of Facts from petitioner's trial (henceforth "S.F. Trial"), Volume 22, testimony of Rigoberto Avila, at p. 116.

2. S.F. Trial, Volume 24, testimony of Marcelina Macias, at pp. 53, 57, 70.

3. S.F. Trial, Volume 19, testimony of Frank Douglas, at pp. 227–29; Volume 24, testimony of Christina Jimenez, at pp. 26–27.

4. S.F. Trial, Volume 19, testimony of Marco Villalobos, at pp. 154–59.

5. S.F. Trial, Volume 19, testimony of Marco Villalobos, at pp. 161–63, 165; testimony of Robert Farina, at pp. 198, 200, 215.

6. S.F. Trial, Volume 19, testimony of Marco Villalobos, at p. 161; testimony of Robert Farina, at p. 197.

nephrine, inserting an oral airway, and beginning chest compressions.[7] Two of the paramedics testified at trial that petitioner appeared unusually calm.[8] After they removed Nicolas' clothing, the paramedics observed a prominent bruise on his abdomen which resembled a footprint.[9] Petitioner disavowed any knowledge of the source of the bruise.[10] As the paramedics attempted to leave to take Nicolas to the nearest hospital, Marcelina returned and was briefly restrained.[11] She then rode with Nicolas to the hospital while petitioner took Dylan to the hospital.[12] Meanwhile, the bruising on Nicolas' abdomen grew progressively more prominent.[13]

## 2. Surgical Efforts to Save Nicolas

Hospital personnel observed Nicolas was non-responsive, was not breathing spontaneously, and exhibited a distended abdomen with bruising on the anterior lateral right side beneath the rib cage.[14] The surgeon who treated Nicolas testified at trial that Nicolas' injuries appeared inconsistent with the history given: Nicolas had no blood pressure; his enlarged abdomen suggested trauma, not suffocation; and x-rays showed air was not confined to the intestines.[15] When he arrived at the hospital, Nicolas' body temperature was only 90 degrees Fahrenheit, what his doctor described as "ice cold," and Nicolas' blood pH was 6.62, significantly below the normal 7.4, which his doctor described as "rarely survivable."[16] Despite the fact Nicolas' likelihood of survival was "very minimal," he was taken to the operating room and given large amounts of fluids, along with epinephrine and dopamine, to help raise his blood pressure.[17]

Once his abdominal cavity was opened, blood was observed pooling on both sides of the interior of the abdomen and his physicians discovered (1) Nicolas' duodenum was split in two locations against the midline of the body along his spine, (2) Nicolas' transverse (upper) colon had been torn from its blood supply, (3) Nicolas' mesentery or intestinal shroud was sheared off, and (4) Nicolas' pancreas was split into two parts.[18] Nicolas' surgeon testified these types of internal injuries were consistent with high speed impact accidents in which the abdomen receives high velocity trauma from a blunt object, causing the internal organs to compress against the spine.[19] Despite the infusion of blood and fluids and the surgical removal of a section of Nicolas' pancreas, the placement of a tube in his stomach to drain

7. S.F. Trial, Volume 19, testimony of Marco Villalobos, at pp. 164–66, 169–70, 175; testimony of Robert Farina, at pp. 197, 200.

8. S.F. Trial, Volume 19, testimony of Marco Villalobos, at pp. 162–63, 168–69; testimony of Robert Farina, at p. 201.

9. S.F. Trial, Volume 19, testimony of Marco Villalobos, at pp. 171–74/ testimony of Robert Farina, at pp. 202, 205, 207–08, 218–09, 223–24.

10. S.F. Trial, Volume 19, testimony of Marco Villalobos, at p. 171.

11. S.F. Trial, Volume 19, testimony of Marco Villalobos, at pp. 184, 189.

12. S.F. Trial, Volume 19, testimony of Marco Villalobos, at pp. 189–90; testimony of Robert Farina, at pp. 203–07.

13. S.F. Trial, Volume 19, testimony of Robert Farina, at pp. 207–08.

14. S.F. Trial, Volume 21, testimony of Dr. George Raschbaum, at pp. 22–25.

15. Id., at p. 23.

16. Id., at pp. 26–27.

17. Id., at pp. 29–30.

18. Id., at pp. 31–33, 35.

19. Id., at p. 33.

away blood, and efforts of his surgeon to stop his internal bleeding, Nicolas expired.[20]

### 3. The Severity of Nicolas' Injuries

Nicolas' surgeon testified further the magnitude of Nicolas' injury made it unlikely Nicolas' fatal injuries were accidental; this was a very painful, immediately incapacitating, injury which would necessarily have resulted in shock as a result of diminished blood pressure from internal bleeding and loss of consciousness within fifteen-to-twenty minutes of injury.[21] He equated Nicolas' injuries (which he described as resulting from a force striking Nicolas from the right side in a slightly upward direction moving toward the center of Nicolas' body) with those which would likely be sustained in a 60–mile–per–hour car crash or from a drop of twenty feet.[22]

### 4. Petitioner's First Police Interview

Late on the evening of Nicolas' injury, petitioner agreed to accompany police to their office and to be interviewed.[23] Just after two a.m., petitioner executed a voluntary statements in which he denied having struck Nicolas and stated he first became aware Nicolas was injured around 6:45 p.m. when Dylan informed him Nicolas was not breathing.[24]

### 5. Petitioner's Second Police Interview

After police later confronted him with a photograph of Nicolas' bruises, petitioner gave a second voluntary statement in which petitioner admitted he had "stamped on" Nicolas with his right foot as Nicolas lay on the floor.[25]

### B. Indictment

On March 16, 2000, an El Paso County grand jury indicted petitioner on a single Count of capital murder, to wit, intentionally and knowingly causing the death of Nicolas Macias, an individual younger than six years of age, by striking Nicolas with petitioner's foot.[26]

### C. Guilt–Innocence Phase of Trial

Jury selection in petitioner's trial commenced March 26, 2001. The guilt-innocence phase of petitioner's trial began April 30, 2001.

### 1. The Prosecution's Case

In addition to the testimony and other evidence summarized above, petitioner's jury also heard Nicolas' five-year-old brother Dylan testify, on the night in question, he had seen the petitioner step on Nicolas.[27] The medical examiner who performed the initial autopsy on Nicolas, Dr.

---

**20.** *Id.*, at pp. 37–38.

**21.** *Id.*, at pp. 41–44.

**22.** *Id.*, at pp. 33, 36, 43–44.

**23.** S.F. Trial, Volume 19, testimony of Tony Tabullo, at pp. 25, 27.

**24.** S.F. Trial, Volume 19, testimony of Tony Tabullo, at pp. 27–29, 47. A copy of petitioner's first statement, admitted into evidence as State Exhibit No. 1, appears in S.F. Trial, Volume 26.

**25.** S.F. Trial, Volume 19, testimony of Tony Tabullo, at pp. 30–37. Petitioner's second statement was admitted into evidence and read into the record in its entirety. *Id.*, at pp. 42–46. A copy of petitioner's second statement, admitted as State Exhibit No. 2, appears in S.F. Trial, Volume 26.

**26.** A copy of the indictment against petitioner appears in the transcript of pleadings, motions, and other documents filed in petitioner's state trial court proceeding (henceforth "Trial Transcript") at p. 3.

**27.** S.F. Trial, Volume 19, testimony of Dylan Michael Salinas, at pp. 136–37.

Juan Contin, testified in pertinent part his examination of Nicolas' body revealed Nicolas had three bruises to the abdominal area: (1) a large, oval-shaped, bruise consistent with a shoe which resulted from blunt force trauma sufficient to crush and transect Nicolas' internal organs, detach Nicolas' intestines from the spine, detach Nicolas' duodenum from the stomach, cut Nicolas' pancreas in two, and detach the large bowel from the spine; (2) a smaller bruise to the left side of the abdomen; and (3) a third bruise to the upper lumbar region in the center of the back near the kidneys.[28] Dr. Contin testified further that, in his opinion, the three bruises to Nicolas' abdomen did not result from a single blow to Nicolas' body and he could not tell whether they were created at the same or different times.[29] Dr. Contin also opined (1) Nicolas' abdominal injuries had been produced by the application of "considerable force," (2) the nature of Nicolas' injuries made it likely he was laying partly on his left side when force was applied to Nicolas' abdomen, crushing his internal organs against his spine, (3) only an object traveling at a very high rate of speed at impact could cause these types of injuries, (4) Nicolas' injuries were caused by the amount of force typically seen in automobile accidents, (5) he did not believe Nicolas' injuries were accidental in nature, (6) if Nicolas' injuries had been caused by a shoe, the extent of Nicolas' injury made it unlikely you would see a clear outline of a shoe print, (7) Nicolas' abdominal injuries were fresh and were likely sustained within fifteen-to-twenty minutes of the arrival of the ambulance at petitioner's home and within an hour of Nicolas' arrival at the hospital, (8) immediately after receiving such injuries, a child would be in shock, unable to move around or play, and noticeably in distress, and (9) Nicolas' internal bleeding began the instant he sustained his injury, after which he would have been cold, clammy, and pale.[30]

Dr. Contin also testified extensively regarding a series of bruises to Nicolas' forehead which (1) he observed only during internal examination of Nicolas' body, (2) he believed were too large and numerous to have been accidental in nature, but (3) he believed were at least several days old because of their yellow hue.[31]

### 2. The Defense's Evidence

A Texas Department of Public Safety expert in footwear comparison called by the defense testified he could not match the shoes worn by petitioner on the date of Nicolas' death to the abdominal bruises photographed on Nicolas' body because the tread pattern he observed on photographs of Nicolas' body did not match petitioner's shoe soles.[32] On cross-examination, however, this same expert admitted (1) he had no knowledge or training regarding the composition of the skin and

---

**28.** S.F. Trial, Volume 20, testimony of Juan Contin, at pp. 28–36.

**29.** *Id.,* at pp. 36–37.

**30.** *Id.,* at pp. 43–44, 46–52, 53–63.

**31.** *Id.,* at pp. 38–42, 44.

In addition to Dr. Contin's testimony regarding the two-to-three-day-old bruising to Nicolas' forehead, the state trial court admitted into evidence graphic photographs taken during Nicolas' autopsy showing Nicolas' scalp being peeled away from his skull to reveal the bruises in question, i.e., State Exhibit Nos. 17–18. The Texas Court of Criminal Appeals subsequently held admission of these graphic photographs was error but only *harmless* error. *Avila v. State,* 2003 WL 21513440, *6–*7 (Tex.Crim.App. July 2, 2003), *cert. denied,* 541 U.S. 935, 124 S.Ct. 1656, 158 L.Ed.2d 355 (2004).

**32.** S.F. Trial, Volume 21, testimony of Juan Rojas, at pp. 131–35, 148–49, 151–54, 173–74.

tissues beneath it or the effects of the impact of footwear on the human body, (2) he had no knowledge regarding the internal damage to Nicolas' body, and (3) the direction of impact was irrelevant to his analysis because his only basis for comparison was an attempt to compare a flat photograph of Nicolas' bruises with the shape and tread pattern he observed on petitioner's shoe soles.[33]

A pathologist who had performed a second autopsy on Nicolas' body, Dr. Fausto Rodriguez, testified for the defense that (1) he believed all of the blunt-force trauma injuries to Nicolas' abdomen could be explained by a single traumatic event, (2) he found only one bruise to Nicolas' abdominal area, (3) he could not determine whether Nicolas' injuries had been accidental or non-accidental in nature, (4) Nicolas' injuries could have resulted from an adult falling on top of Nicolas, and (5) it was not possible for a pathological examination to determine the intent of the person who struck Nicolas.[34] On cross-examination, Dr. Rodriguez admitted (1) he could not dispute Dr. Contin's findings regarding Nicolas' *head* injuries because, by the time Dr. Rodriguez performed the second autopsy, Nicolas' head was in an advanced state of decomposition and (2) there appeared to be a "footprint" on Nicolas' body.[35] However, when pressed by the prosecutor about Nicolas' abdominal injuries, Dr. Rodriguez insisted (1) Nicolas' abdomen was very well-preserved at the time of the second autopsy, (2) he observed only a single, large, bruise to Nicolas' abdominal area, (3) he believed the smaller bruise Dr. Contin reported observing on

the left side of Nicolas' abdomen was the product of lividity, i.e., the pooling of blood, on that side of Nicolas' abdomen, and (4) he did not observe the bruise to Nicolas' back Dr. Contin had reported finding, which led him to conclude that "bruise" was also likely the product of lividity rather than a separate injury to petitioner's abdominal area.[36]

A number of friends and relatives of petitioner testified to petitioner's good reputation for being peaceful and non-violent toward children.[37]

Petitioner then took the stand and testified (1) he was watching television around seven p.m. when Dylan informed him Nicolas was not breathing, (2) he carried Nicolas, who was not breathing, into the living room and called 911, (3) he tried to perform CPR on Nicolas but had never done so before, (4) he paged Nicolas' mother, (5) he took Dylan to the hospital while Nicolas' mother rode with the paramedics and Nicolas in the ambulance, (6) he gave Detective Tabullo a detailed written statement concerning the events of that evening, (7) while he initialed each paragraph and signed his first statement he never read it before doing so, (8) he grew tired as Tabullo questioned him, (9) he later signed but did not read or initial a second statement because Tabullo indicated he could leave if he signed same, (10) neither of the written statements he signed accurately reflect the events on the evening in question, (11) he initialed and signed the first statement without reading same because the detective told him to do so, (12) he signed the second statement without reading same, and (13) he did not cause

**33.** *Id.,* at pp. 159–76.

**34.** S.F. Trial, Volume 22, testimony of Fausto Rodriguez, at pp. 11–24, 41.

**35.** *Id.,* at pp. 28–34, 47–48.

**36.** *Id.,* at pp. 39–40, 42–48.

**37.** S.F. Trial, Volume 22, testimony of Lisa Moreno, at p. 88; testimony of David Lara, at p. 98; testimony of Jimmy Madrid, at p. 103; testimony of Javier Parala, at p. 109.

Nicolas' death.[38] On cross-examination, petitioner admitted Nicolas was ambulatory and not in pain when Marcelina left that evening and Nicolas was wearing a Onesie over a diaper.[39]

### 3. The Verdict

On May 3, 2001, the jury returned its verdict, finding petitioner guilty of capital murder.[40]

### D. Punishment Phase of Trial

The punishment phase of petitioner's capital murder trial commenced on May 4, 2001,

#### 1. The Prosecution's Evidence

Nicolas' five-year-old brother Dylan Salinas testified, on the evening of Nicolas' injury, petitioner directed Dylan to step on Nicolas before petitioner did so and denied ever saying he had put his hand over Nicolas' mouth.[41]

The jury heard the audiotape recording of petitioner's 911 call on the evening of Nicolas' murder, which had been received at 7:02 p.m.

A family friend testified (1) since Nicolas' death, his siblings had exhibited sleeplessness, fear, crying spells, and clinging to their mother and (2) when she was informed of Nicolas' death, Marcelina Macias wept and fainted.[42]

Nicolas' mother testified (1) when she left their home on the evening of Nicolas' murder, Nicolas and Dylan were chasing each other around the apartment as she kissed them goodbye, (2) petitioner paged her around 6:50 p.m. that evening, (3) when she arrived back at her home, she observed EMS personnel working on Nicolas and she became hysterical, (4) when Dylan and petitioner arrived at the hospital, Dylan was scared and clingy toward her, (5) prior to the evening in question, petitioner had never struck or even disciplined any of her children, (6) she had been dating petitioner for about four months before Nicolas' death, (7) petitioner first began babysitting her children at the beginning of February, 2000, about a month before Nicolas' death, (8) she never saw petitioner get angry with her children, but (9) she was aware petitioner was jealous of her seeing other men.[43]

#### 2. The Defense's Evidence

The defense presented a number of friends and relatives who all described petitioner as a kind, caring, soft-spoken, non violent person and a loving, supportive, father to his own son.[44]

---

**38.** S.F. Trial, Volume 22, testimony of Rigoberto Avila, at pp. 114–35.

**39.** Id., at pp. 140–42.

**40.** S.F. Trial, Volume 23, at pp. 84–87.

For unknown reasons, neither the jury charge from the guilt-innocence phase of petitioner's trial nor the jury's verdict form from that phase of trial were included in the state court records submitted to this Court by respondent. As best this Court can discern, neither of those documents were ever included in the state courts records submitted to the Texas Court of Criminal Appeals on direct appeal or during petitioner's state habeas corpus proceeding.

**41.** S.F. Trial, Volume 24, testimony of Dylan Salinas, at pp. 15–20.

**42.** S.F. Trial, Volume 24, testimony of Carlos Estorga, Jr., at pp. 36–49.

**43.** S.F. Trial, Volume 24, testimony of Marcelina Macias, at pp. 47–89.

**44.** S.F. Trial, Volume 24, testimony of Gloria Mabel Avila (petitioner's step-mother), at pp. 92–103; testimony of Gelina Garcia, at pp. 112–14; testimony of Delia Mendoza, at pp. 115–18; testimony of David Lara, at pp. 118–22; testimony of Javier Parala, at pp. 123–26; testimony of Jimmy Madrid, at pp. 127–32; testimony of Lisa Moreno, at pp. 132–43; tes-

### 3. Verdict

On May 7, 2001, the jury returned its verdict at the punishment phase of petitioner's capital trial, finding (1) beyond a reasonable doubt there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the defendant's personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment for the defendant.[45] The trial court immediately sentenced petitioner.[46]

***

timony of Edmundo Avila, at pp. 143–46 (petitioner's twin brother); testimony of Francis Gonzales (petitioner's mother), at pp. 146–49; testimony of Rigoberto Avila, Sr., at pp. 149–52.

**45.** S.F. Trial, Volume 25, at pp. 58–60; Trial Transcript, at pp. 393–95.

**46.** S.F. Trial, Volume 25, at p. 61.

**47.** As points of error on direct appeal, petitioner argued (1) the trial court failed to conduct a proper *Jackson v. Denno* hearing before determining petitioner's second written statement was voluntary, (2) the trial court erred in failing to suppress petitioner's second written statement, (3) the trial court erred in admitting several graphic photographs of Nicolas' body, (4) the trial court erred in ruling five-year-old Dylan Salinas competent to testify at trial, (5) there was legally insufficient evidence showing petitioner's propensity for future dangerousness, (6) petitioner's trial counsel rendered ineffective assistance by (a) conceding during closing argument at the punishment phase of trial that petitioner was guilty, (b) admitting petitioner had misled emergency medical personnel regarding the source of Nicolas' injuries, (c) failing to tender a videotape recording showing Dylan Salinas was not competent to be a witness at trial, and (d) having Nicolas exhumed for a second autopsy, and (7) the prosecutor's arguments that Nicolas' had been the victim of multiple blows prejudiced petitioner.

### E. Direct Appeal

Petitioner appealed his conviction and sentence.[47] In an unpublished opinion issued July 2, 2003, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence. *Avila v. State*, 2003 WL 21513440 (Tex.Crim.App. July 2, 2003), *cert. denied*, 541 U.S. 935, 124 S.Ct. 1656, 158 L.Ed.2d 355 (2004). The United States Supreme Court denied petitioner's certiorari petition on March 22, 2004. *Avila v. Texas*, 541 U.S. 935, 124 S.Ct. 1656, 158 L.Ed.2d 355 (2004).

### F. State Habeas Corpus Proceeding

On May 19, 2003, petitioner filed his application for state habeas corpus relief.[48]

***

**48.** Transcript of pleadings, motions, and other documents filed in petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript"), at pp. 7–75.

As grounds for state habeas relief, petitioner argued (1) the prosecution violated petitioner's constitutional rights under the holding in *Brady v. Maryland* by withholding from the defense the substance of the opinions of prosecution expert witness Dr. Harry Wilson, (2) petitioner's trial counsel rendered ineffective assistance by failing to (a) discover and present the exculpatory and mitigating opinions of Dr. Harry Wilson, (b) present other mitigating evidence at the punishment phase of trial, and (c) prevent the exclusion of venire members improperly excluded under *Witherspoon*, (3) the Texas capital scheme unconstitutionally precludes a capital sentencing from considering evidence of a defendant's good character, (4) members of petitioner's jury venire were improperly excluded based on their personal views toward capital punishment in violation of the Supreme court's holding in *Witherspoon*, (5) there was no jury finding beyond a reasonable doubt on the mitigation or *Penry* capital sentencing special issue in violation of the Supreme Court's holdings in *Apprendi v. New Jersey* and *Ring v. Arizona*, and (6) petitioner's appellate counsel rendered ineffective assistance by failing to present a point of error on direct appeal asserting petitioner's *Apprendi/Ring* challenge to the Texas capital sentencing mitigation special issue.

Without holding an evidentiary hearing, in an Order issued June 28, 2004, the state trial court issued its findings of fact, conclusions of law, and recommendation that petitioner's application for state habeas relief be denied.[49] In an unpublished Order issued September 29, 2004, the Texas Court of Criminal Appeals adopted the state habeas trial court's findings of fact, conclusions of law, and denied petitioner's application for state habeas corpus relief. *Ex parte Rigoberto Avila,* App. No. 59,-662–01 (Tex.Crim.App. September 29, 2004).

### G. *Procedural History in this Court*

On September 19, 2005, petitioner filed his petition for federal habeas corpus relief in this Court. *Docket entry no, 16.* On February 1, 2006, respondent filed his original answer. *Docket entry no. 24.* On April 11, 2006, petitioner filed his reply to respondent's answer. *Docket entry no. 21.*

### II. *AEDPA Standard of Review*

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton,* 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 L.Ed.2d 334 (2005); *Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza,* 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' "). A state court's failure to cite governing Supreme Court authority does not, per se, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.' " *Mitchell v. Esparza,* 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreason-

---

**49.** State Habeas Transcript, at pp. 217–28.

ably applies that principle to the facts of the petitioner's case. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1439; *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith,* 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan,* —— U.S. ——, ——, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins v. Smith,* 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent,* 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

■ Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado,* 541 U.S. 652, 660–61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.' "); *Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. A petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan,* —— U.S. at ——, 127 S.Ct. at 1939–40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.' "); *Rice v. Collins,* 546 U.S. 333, 339, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' "); *Miller–El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005) ("we presume the Texas court's factual findings to be sound unless Miller–El rebuts the 'presumption of correctness by clear and convincing evidence.' "); 28 U.S.C. § 2254(e)(1).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller–El v. Dretke,* 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

■ Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See St. Aubin v. Quarterman,* 470 F.3d 1096, 1100 (5th Cir.2006)(holding

Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* — U.S. —, 127 S.Ct. 2133, 167 L.Ed.2d 869 (2007); *Amador v. Quarterman,* 458 F.3d 397, 410 (5th Cir.2006)(holding the same), *cert. denied,* — U.S. —, 127 S.Ct. 2129, 167 L.Ed.2d 866 (2007); *Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir.2003)(holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004); *Anderson v. Johnson,* 338 F.3d 382, 390 (5th Cir.2003)(holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir.2002) (*en banc*) (holding that a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

## III. *Evidence of Good Character in the Texas Capital Sentencing Scheme*

### A. *The Claim*

In his fifth claim for relief herein, petitioner argues his capital sentencing jury was effectively precluded from giving mitigating effect to his evidence of good character because the mitigation or *Penry* capital sentencing special issue does not permit the jury to consider evidence unrelated to a defendant's moral blameworthiness.[50]

### B. *State Court Disposition*

The Texas Court of Criminal Appeals rejected this same claim on the merits in the course of petitioner's state habeas corpus proceeding.[51]

### C. *AEDPA Review*

#### 1. *Clearly Established Federal Law*

■ The constitutional standard for evaluating the efficacy of punishment-phase jury instructions and special issues is well-settled: "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Abdul–Kabir v. Quarterman,* — U.S. —, —, 127 S.Ct. 1654, 1674, 167 L.Ed.2d 585 (2007); *Ayers v. Belmontes,* — U.S. —, —, 127 S.Ct. 469, 474, 166 L.Ed.2d 334 (2006); *Johnson v. Texas,* 509 U.S. 350, 367, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993); *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). "Although the reasonable likelihood standard does not require that the defendant prove that it was more likely than not that the jury was prevented from giving effect to the evidence, the standard requires more than a mere possibility of such a bar." *Johnson v. Texas,* 509 U.S. at 367, 113 S.Ct. at 2669; *Boyde v. California,* 494 U.S. at 380, 110 S.Ct. at 1198. In evaluating the instructions, courts do not engage in a technical parsing of the relevant language but instead approach the instructions the same way the jury would—with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Johnson v. Texas,* 509 U.S. at 368, 113 S.Ct. at 2669; *Boyde v.*

---

**50.** Petitioner's Habeas Corpus Petition, filed September 19, 2005, docket entry no. 16 (henceforth "Petition"), at pp. 144–56.

**51.** State Habeas Transcript, at p. 223.

*California,* 494 U.S. at 381, 110 S.Ct. at 1198.

### 2. *The Punishment Phase of Petitioner's Trial*

During both the guilt-innocence and punishment phases of petitioner's trial, the defense presented extensive testimony describing petitioner not merely as non-violent but, rather, kind, soft-spoken, and a loving and supportive father.[52]

At the punishment phase of petitioner's trial, the trial court instructed the jury in pertinent part, as follows:

> In deliberating on "Special Issue" No. 1 you shall consider all the evidence at the guilt or innocence stage of this trial, including evidence of the Defendant's background or character or the circumstances of the offense that militates for or against the imposition of the death penalty.[53]
>
> In answering "Special Issue" No. 2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the Defendant's blameworthiness.[54]

The two special issues included in petitioner's punishment-phase jury charge inquired as follows:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, RIGOBERTO AVILA, would commit criminal acts of violence that would constitute a continuing threat to society?[55]
>
> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the Defendant, that there is [sic] a sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?[56] Petitioner's jury answered the first special issue affirmatively and the second, negatively.[57]

During closing argument at the punishment phase of petitioner's capital trial, petitioner's defense counsel repeatedly pointed to the evidence before the jury showing both petitioner's good character and the total absence of any evidence showing petitioner had ever engaged in any other violent or criminal act as justifying a negative answer to the first special issue regarding future dangerousness and arguing the petitioner's crime was an "isolated incident."[58] The prosecution, in reply, emphasized the circumstances of petitioner's offense (including petitioner's lack of remorse during his guilt-innocence phase trial testimony), argued petitioner's character witnesses had no personal knowledge regarding the heinous details of petitioner's offense, but never suggested petitioner's evidence of good character was irrelevant to either of the issues before the jury at the punishment phase of trial.[59]

### 3. *Synthesis*

 Petitioner's argument focuses on what he perceives to be the restrictive nature of the trial court's definition of "mitigating evidence" in connection with

---

52. *See* notes 37 & 44, *supra,* and accompanying text.

53. Trial Transcript, at p. 390.

54. Trial Transcript, at p. 391.

55. Trial Transcript, at p. 393.

56. Trial Transcript, at p. 394.

57. Trial Transcript, at pp. 393–94.

58. S.F. Trial, Volume 25, at pp. 37–45.

59. S.F. Trial, Volume 25, at pp. 46–56.

the second special issue, i.e., evidence which reduces the defendant's blameworthiness. However, petitioner ignores the obvious relevance of his good character evidence to the first Texas capital sentencing special issue, i.e., the issue of future dangerousness. Nothing in the Supreme Court's Eighth Amendment jurisprudence requires a capital sentencing jury to consider evidence of a defendant's good character in multiple contexts. On the contrary, the Supreme Court has emphasized that states are permitted to shape a jury's consideration of mitigating evidence, so long as all such evidence may be given full effect. *See Johnson v. Texas,* 509 U.S. 350, 369–71, 113 S.Ct. 2658, 2670–71, 125 L.Ed.2d 290 (1993)(holding the mitigating value of a defendant's youth could be adequately considered by a Texas capital sentencing jury without the necessity of a *Penry* instruction or special issue); *Saffle v. Parks,* 494 U.S. 484, 493, 110 S.Ct. 1257, 1263, 108 L.Ed.2d 415 (1990)("The State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whim and caprice."). Evidence of a defendant's good character can find adequate expression through the future dangerousness special issue. *Coble v. Dretke,* 444 F.3d 345, 363 (5th Cir.2006).

The Supreme Court views the future dangerousness special issue as allowing a capital sentencing jury to consider a wide array of evidence tied to the defendant's personal culpability. *See Abdul–Kabir v. Quarterman,* —— U.S. at ——, 127 S.Ct. at 1670 (recognizing that, even before the Supreme Court's holding in *Penry v. Lynaugh,* the Texas capital sentencing special issues provided an adequate vehicle for the evaluation of mitigating evidence offered to disprove deliberateness or future dangerousness); *Johnson v. Texas,* 509 U.S. at 368–69, 113 S.Ct. at 2669–70 (hold-

ing the Texas special issue addressing future dangerousness was sufficiently broad to permit the jury's consideration of the mitigating effects of the defendant's youth).

Evidence of a defendant's good character or lack of a history of violent conduct by their very nature tend to support a finding that the defendant's commission of a capital offense was an aberrational act, unlikely to occur again in the future. The forward-looking future-dangerousness inquiry is not independent of an assessment of personal culpability. *Ayers v. Belmontes,* —— U.S. at ——, 127 S.Ct. at 475; *Johnson v. Texas,* 509 U.S. at 369, 113 S.Ct. at 2670. Thus, the first capital sentencing special issue afforded petitioner's jury an adequate vehicle for giving mitigating effect to petitioner's evidence of his good character and non-violent life-history.

Petitioner's trial counsel argued at the punishment phase of petitioner's trial that his client's good character and lack of a history of violent or criminal conduct showed petitioner's capital offense was an isolated incident unlikely to recur. Nothing in the plain language or commonsense meaning of petitioner's punishment-phase jury instructions was likely construed by the jury as foreclosing its consideration of the mitigating value of petitioner's evidence of his good character.

Even before the "mitigation" or *Penry* special issue was added to the Texas capital sentencing scheme, the Supreme Court, the Fifth Circuit, and this Court interpreted the Texas capital sentencing special issues as sufficiently broad to permit adequate jury consideration of a defendant's evidence of good character. *See Graham v. Collins,* 506 U.S. 461, 475, 113 S.Ct. 892, 902, 122 L.Ed.2d 260 (1993)(holding evidence of good character introduced by

Texas capital murder defendant tried before addition of the *Penry* special issue to Texas capital sentencing scheme was nonetheless subject .to adequate consideration by the capital sentencing jury); *Nichols v. Scott,* 69 F.3d 1255, 1278 (5th Cir.1995)(evidence of defendant's good character could be adequately considered even without a Penry special issue), *cert. denied,* 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996); *Crank v. Collins,* 19 F.3d 172, 175 (5th Cir.1994)(evidence of defendant's good character could be adequately considered even in absence of a *Penry* special issue), *cert. denied,* 512 U.S. 1214, 114 S.Ct. 2699, 129 L.Ed.2d 825 (1994); *James v. Collins,* 987 F.2d 1116, 1122 (5th Cir.1993)(holding the same), *cert. denied,* 509 U.S. .947, 114 S.Ct. 30, 125 L.Ed.2d 780 (1993); *Cordova v. Johnson,* 993 F.Supp. 473, 496 & n. 122 (W.D.Tex.1998)(holding the same), *appeal denied,* 157 F.3d 380 (5th Cir.1998), *cert. denied,* 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999).

Moreover, insofar as petitioner argues the Texas statutory definition of "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness" somehow circumscribes a capital sentencing jury's ability to give "mitigating" effect to evidence of a defendant's good character, that argument defies logic. Evidence which tends to establish a defendant's commission of a violent crime was an aberrational act (because it was inconsistent with the defendant's background and character) by its very nature reduces the defendant's moral blameworthiness. No reasonable juror could have construed the jury instructions at the punishment phase of petitioner's trial as precluding the jury's consideration of the inherently mitigating effect of evidence showing petitioner's murder of Nicolas Macias was an aberrational act. Petitioner's trial counsel argued precisely

this point in connection with the future dangerousness issue and the relevance of the same evidence and argument to the *Penry* or mitigation special issue was rampantly obvious.

Under such circumstances, it is not reasonably likely the petitioner's jury construed the punishment-phase jury instructions as precluding it from considering and giving mitigating effect to petitioner's evidence of his good character and non-violent background.

### 4. Conclusion

Accordingly, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's constitutional complaint regarding · petitioner's punishment-phase jury instructions was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and state habeas corpus proceedings.

### IV. *Ring v. Arizona and Apprendi v. New Jersey Claim*

### A. *The Claim*

In his third claim herein, petitioner argues the Texas capital sentencing scheme's Penry or mitigation special issue is constitutionally defective under the Supreme Court's holdings in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because, as currently structured, the Texas mitigation special issue does not require the prosecution to carry its burden of persuasion "beyond a reasonable

doubt." [60]

## B. State Court Disposition

The Texas Court of Criminal Appeals rejected this same claim on the merits in the course of petitioner's state habeas corpus proceeding.[61]

## C. AEDPA Review

### 1. Clearly Established Federal Law

In *Apprendi v. New Jersey, supra,* the Supreme Court struck down on due process and jury trial grounds a state scheme which permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing range for the offense by a factor of one hundred percent, *Apprendi,* 530 U.S. at 497, 120 S.Ct. at 2366. The Supreme Court's opinion in *Apprendi* emphasized it was merely extending to the state courts the same principles discussed in Justice Stevens' and Justice Scalia's concurring opinions in *Jones v. United States,* 526 U.S. 227, 252–53, 119 S.Ct. 1215, 1228–29, 143 L.Ed.2d 311 (1999): other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362–63. Put more simply, the Supreme Court held (1) it was

unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal is exposed and (2) all such findings must be established beyond a reasonable doubt. *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2363.

 Two years later, in *Ring v. Arizona, supra,* the Supreme court applied the holding and its reasoning in *Apprendi* to strike down a death sentence in a case in which the jury had declined to find the defendant guilty of pre-meditated murder during the guilt-innocence phase of a capital trial (instead finding the defendant guilty only of felony murder) but a trial judge subsequently concluded the defendant should be sentenced to death based upon *factual* determinations that (1) the offense was committed in expectation of receiving something of pecuniary value (i.e., the fatal shooting of an armored van guard during a robbery) and (2) the foregoing aggravating factor out-weighed the lone mitigating factor favoring a life sentence (i.e., the defendant's minimal criminal record).[62] *Ring,* 536 U.S. at 609, 122 S.Ct. at 2443. The Supreme Court emphasized, as it had in *Apprendi,* the dispositive question "is not one of form, but of effect": "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring,* 536 U.S. at 602, 122 S.Ct. at

---

**60.** Petition, at pp. 127–41; Petitioner's Reply to Respondent's Original Answer, filed April 11, 2006, docket entry no. 27 (henceforth "Reply"), at pp. 28–31.

**61.** State Habeas Transcript, at p. 226.

**62.** In point of fact, the Arizona trial judge found a second aggravating factor applied in Ring's case, i.e., Ring's comments after the fatal shooting in which he chastised his co-conspirators for their failure to praise Ring's

marksmanship rendered his offense "especially heinous, cruel, or depraved." The Arizona Supreme Court later held there was insufficient evidence to support the trial judge's finding of depravity but nonetheless reweighed the remaining aggravating factor against the lone mitigating factor and affirmed Ring's death sentence. *Ring v. Arizona,* 536 U.S. at 595–96, 122 S.Ct. at 2435–36.

2439. "A defendant may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439–40, *quoting Apprendi*, 530 U.S. at 483, 120 S.Ct. at 2359. Because Ring would not have been subject to the death penalty but for the trial judge's factual determination as to the existence of an aggravating factor, the Supreme Court declared Ring's death sentence violated the right to trial by jury protected by the Sixth Amendment. *Ring*, 536 U.S. at 609, 122 S.Ct. at 2443.

### 2. *Punishment Phase of Petitioner's Trial*

As explained in Section III.C.2. above, at the punishment phase of petitioner's capital trial, the jury was faced with two special issues: the first inquired whether the prosecution had established *beyond a reasonable doubt* that a probability existed the petitioner would commit criminal acts of violence constituting a continuing threat to society; and the second inquired whether, without any express or implicit burden of proof assigned, the mitigating evidence warranted a sentence of less than death.[63] This submission was consistent with Section 2 of Article 37.071 of the Texas Code of Criminal Procedure, which mandates the state carry the burden of proving the defendant's future dangerousness "beyond a reasonable doubt," but imposes no similar burden of proof requirement for the *Penry* or mitigation special issue.

### 3. *Synthesis*

Petitioner's argument in support of this claim equates his jury's negative answer to the *Penry* or mitigation special issue included in the Texas capital sentencing scheme with the Arizona trial judge's factual findings regarding the existence of aggravated factors in *Ring*. However, petitioner misperceives the true nature of the Texas capital sentencing scheme.

The Supreme Court explained in *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), that the Eighth Amendment addresses two different but related aspects of capital sentencing: the eligibility decision and the selection decision. *Tuilaepa*, 512 U.S. at 971, 114 S.Ct. at 2634. The Supreme Court's analysis of those two aspects of capital sentencing provides a comprehensive system for analyzing Eighth Amendment claims:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravated circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague. * * *
>
> We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection

---

**63.** *See* notes 53–56, *supra,* and accompanying text.

stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Tuilaepa,* 512 U.S. at 971–73, 114 S.Ct. at 2634–35 (citations omitted).

■■■■ The Supreme Court clearly pronounced in *Tuilaepa* that States may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa,* 512 U.S. at 974, 114 S.Ct. at 2636. The Supreme Court held further, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa,* 512 U.S. at 978, 114 S.Ct. at 2638.

In *Loving v. United States,* 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996), the Supreme Court discussed the first part of the *Tuilaepa* analysis, i.e., the eligibility decision, as follows:

The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Loving,* 517 U.S. at 755, 116 S.Ct. at 1742 (citations omitted).[64]

The Arizona capital sentencing scheme the Supreme Court addressed in *Ring* relied upon a trial judge's factual findings of "aggravating" factors and directed the trial judge to weigh those aggravating factors against any mitigating factors found to apply to the defendant. Thus the Arizona trial judge's factual findings in *Ring* were part of the constitutionally-mandated eligibility determination, i.e., the narrowing function.

■■■■ In contrast, the Texas capital sentencing scheme under which petitioner was tried, convicted, and sentenced performed the constitutionally-required narrowing function discussed in *Tuilaepa* and *Loving* at the guilt-innocence phase of petitioner's trial and further narrowed the category of those eligible for the death penalty by requiring a finding, beyond a reasonable doubt, of future dangerousness. *See Sonnier v. Quarterman,* 476 F.3d 349, 365–67 (5th Cir.2007)(recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh,* —— U.S. ——, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), performs the constitutionally-required narrowing function through its statutory definition of capital murder and further narrows the category of those eligible for the death penalty by

**64.** The Supreme Court subsequently elaborated on the distinction between the narrowing function or eligibility decision and the selection phase of a capital sentencing proceeding in *Buchanan v. Angelone,* 522 U.S. 269, 275–77, 118 S.Ct. 757, 761–62, 139 L.Ed.2d 702 (1998).

requiring an additional fact finding, beyond a reasonable doubt, that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society).

Unlike Arizona's weighing scheme, the Texas capital sentencing scheme performs the constitutionally-mandated narrowing function, i.e., the process of making the "eligibility decision," at the guilt-innocence phase of a capital trial by virtue of the manner with which Texas defines the offense of capital murder in Section 19.03 of the Texas Penal Code. *See Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at 2666 (holding that its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifications of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. 231, 243–47, 108 S.Ct. 546, 554–55, 98 L.Ed.2d 568 (1988)(comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek v. Texas*, 428 U.S. 262, 268–75, 96 S.Ct. 2950, 2955–57, 49 L.Ed.2d 929 (1976) (*plurality opinion* recognizing the Texas capital sentencing scheme narrows the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory schemes which require proof of aggravating circumstances to justify the imposition of the death penalty).

The Texas capital sentencing scheme under which petitioner was convicted and sentenced involved a significantly different approach to capital sentencing than the Arizona scheme involved in *Ring*. By virtue of (1) its guilt-innocence phase determination *beyond a reasonable doubt* that the petitioner committed *capital* murder, as defined by applicable Texas law, and (2) its factual finding of future dangerousness, also made *beyond a reasonable doubt*, petitioner's jury found *beyond a reasonable doubt* the petitioner was *eligible* to receive the death penalty. *Sonnier v. Quarterman*, 476 F.3d at 365–67. In contrast, *Ring's* jury made no analogous factual findings. Instead, *Ring's* Arizona jury found beyond a reasonable doubt only that *Ring* was guilty of "felony murder," a wholly separate offense from the offense of capital murder as defined under Texas law.

The petitioner's first capital sentencing special issue, i.e., the future dangerousness issue, included a "beyond a reasonable doubt" burden of proof squarely placed on the prosecution. Petitioner's jury's factual finding on the future dangerousness special issue was an essential part of the procedural process under Texas law for determining whether the petitioner was *eligible* to receive the death penalty.

In contrast, the *Penry* or "mitigation" special issue employed at the punishment phase of petitioner's capital trial was designed to address the second aspect of capital sentencing discussed in *Tuilaepa*, i.e., the constitutional requirement that the jury be given an opportunity "to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, —— U.S. at ——, 126 S.Ct. at 2524–25; *Sonnier v. Quarterman*, 476 F.3d at 365. "The use of mitigation evidence is a product of the requirement of individualized sentencing." *Kansas v. Marsh*, —— U.S. at ——, 126 S.Ct. at 2525.

The Supreme Court has distinguished the constitutional requirements of the *eligibility* decision, i.e., the narrowing function, and the *selection* decision, i.e., the individualized assessment of mitigating cir-

cumstances, holding the latter requires only that the sentencing jury be given broad range to consider all relevant mitigating evidence but leaving to the States wide discretion on how to channel the sentencing jury's balancing of mitigating and aggravating factors. *See Kansas v. Marsh,* —— U.S. at ——, 126 S.Ct. at 2525 (holding, in connection with the *selection* phase of a capital sentencing proceeding, the Constitution mandates only that (1) the defendant has a right to present the sentencing authority with information relevant to the sentencing decision and (2) the sentencing authority is obligated to consider that information in determining the appropriate sentence); *Tuilaepa,* 512 U.S. at 978, 114 S.Ct. at 2638 (holding, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment.").

At the *selection* phase of a capital trial, the Supreme Court has left to the States the decision whether to channel a sentencing jury's weighing of mitigating evidence or grant the jury unfettered discretion to consider all relevant mitigating evidence and weigh same in any manner the jury deems reasonable. *See Kansas v. Marsh,* —— U.S. ——, 126 S.Ct. at 2525, 165 L.Ed.2d 429 ("So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed."). Likewise, the Supreme Court has not yet imposed a particular burden of proof requirement with regard to a capital sentencing jury's consideration of mitigating evidence when such consider-

ation occurs exclusively within the selection process.

"[D]iscretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has been found that the defendant is a member of the class made eligible for that penalty."

*Tuilaepa,* 512 U.S. at 979, 114 S.Ct. at 2639 (citations omitted).

 "[T]here is no constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Johnson v. Texas,* 509 U.S. at 362, 113 S.Ct. at 2666 (*quoting Boyde v. California,* 494 U.S. at 377, 110 S.Ct. at 1196). "We have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Kansas v. Marsh,* —— U.S. at ——, 126 S.Ct. at 2525.

As explained above, the "eligibility" decision required by the Constitution is satisfied under Texas law by the jury's findings "beyond a reasonable doubt" that (1) the defendant is guilty of capital murder as defined under Section 19.03 of the Texas Penal Code and (2) there is a probability the defendant will commit criminal acts of violence that would constitute a continuing

threat to society. *Sonnier v. Quarterman,* 476 F.3d at 365–67. This is all the Constitution requires to satisfy the concerns discussed by the Supreme Court in *Ring.*

■ Consistent with the Supreme Court's holdings in *Kansas v. Marsh, Tuilaepa v. California,* and *Johnson v. Texas,* a Texas capital sentencing jury may be granted "unfettered discretion" regarding how it should weigh the mitigating evidence, if any, relevant to a particular defendant's background and character against the aggravating circumstances of the defendant's offense and the defendant's demonstrated propensity for future dangerousness. Thus, the Texas Legislature's decision *not* to assign a particular burden of proof on either party in connection with the Texas capital sentencing scheme's *Penry* or mitigation special issue falls well within the broad range of discretionary authority a State may exercise in connection with the *selection* phase of a capital trial.[65]

The Arizona trial judge's affirmative factual finding regarding the existence of an aggravating factor made in *Ring* did not serve the same constitutionally-mandated purpose as the jury's negative answer to the *Penry* special issue made at petitioner's Texas capital murder trial. The Arizona trial judge's factual findings were designed to satisfy the "eligibility" requirement discussed in *Tuilaepa.* In jurisdictions such as Texas (where the "eligibility" decision discussed in *Tuilaepa* is made at the guilt-innocence phase of a capital trial) the only factual issues before the jury at the punishment phase of a capital trial address only the "selection"

decision identified by the Supreme Court in *Tuilaepa.* Even if Texas' future dangerousness special issue could be construed as falling within the scope of the constitutionally-mandated eligibility decision, Texas law clearly places the burden of proving same beyond a reasonable doubt on the prosecution.

Thus, the procedural requirements applicable to the *eligibility* decision in weighing jurisdictions such as Arizona (where specific findings of aggravating factors are made during a separate post-conviction proceeding and then weighed against any "mitigating" factors also found by the sentencing authority) are inapplicable to a Texas capital sentencing jury's *selection* decision, i.e., its determination as to whether the mitigating evidence in a particular case warrants a sentence of less than death for a criminal defendant who has already been convicted beyond a reasonable doubt of capital murder and already determined beyond a reasonable doubt to pose a risk of future dangerousness. *See Scheanette v. Quarterman,* 482 F.3d 815, 828 (5th Cir.2007)("a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death."); *Sonnier v. Quarterman,* 476 F.3d at 363–67 (holding the deletion of the former special issue inquiring into whether the defendant acted "deliberately" in connection with the capital murder from the Texas capital sentencing scheme did not render same vulnerable to attack on Eighth Amendment grounds); *Granados v. Quarterman,* 455 F.3d 529, 537 (5th Cir.2006)(distinguishing *Ring* and *Apprendi* on the ground a jury's affirmative answer to the Texas capital sentencing

---

**65.** It can be argued the absence of a burden of proof standard in the *Penry* or mitigation special issue could be reasonably expected to enure to the benefit of defendants because a shrewd defense counsel could argue the absence of an instruction mandating a particular burden of proof permits the jury to answer the Penry special issue affirmatively if the jury concludes there is only a scintilla of evidence supporting an affirmative finding on that special issue.

scheme's *Penry* or "mitigation" special issue reduces a sentence from death rather than increasing it to death, as was the case with the factual findings made by the trial judges in *Apprendi* and *Ring*), *cert. denied,* —— U.S. ——, 127 S.Ct. 732, 166 L.Ed.2d 568 (2006); *Rowell v. Dretke,* 398 F.3d 370, 379 (5th Cir.2005) ("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."), *cert. denied,* 546 U.S. 848, 126 S.Ct. 103, 163 L.Ed.2d 117 (2005).

### 4. Conclusion

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Ring/Apprendi* claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and state habeas corpus proceedings.

## V. Brady Claim

### A. The Claim

In his first claim for relief herein, petitioner argues he was denied his constitutional rights under the Supreme Court's holding in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when the prosecution withheld from defense counsel the personal knowledge and expert opinions of prosecution expert Dr. Harry Wilson which could have been used to impeach the prosecution's expert trial witnesses.[66]

### B. State Court Disposition

#### 1. Pretrial Proceedings

During a pretrial hearing held April 28, 2000, petitioner's trial counsel requested the state trial court appoint a medical expert to assist the defense in its preparations for trial. In the course of that hearing, the prosecution identified Dr. Harry Wilson, an El Paso pediatric pathologist, as one of its experts and advised the trial court Dr. Wilson could not be appointed to assist the defense without creating a "conflict."[67] On May 28, 2000, the trial court appointed Dr. Fausto Rodriguez as expert for the defense.[68] In several subsequent pleadings, the prosecution repeatedly identified Dr. Harry Wilson as a potential prosecution fact witness and expert witness.[69] In addition, the prosecution also issued multiple subpoenas for Dr. Wilson.[70]

#### 2. Petitioner's Trial

As explained above, at the guilt-innocence phase of petitioner's trial, medical examiner Dr. Juan Contin testified he observed three distinct bruises on Nicolas' torso which Dr. Contin attributed to three separate blows having been delivered to Nicolas: the large bruise to the lower left front of Nicolas' abdomen, a bruise to the middle lumbar region of Nicolas' back near the kidneys, and a smaller bruise to the left side of the abdomen.[71] In their closing arguments at the guilt-innocence phase of trial, each of the prosecutors emphasized Dr. Contin's testimony and argued the presence of multiple bruises to Nicolas'

---

66. Petition, at pp. 56–109; Reply, at pp. 12–25.

67. Trial Transcript, at pp. 60–61.

68. Trial Transcript, at p. 65.

69. Trial Transcript, at pp. 123–30, 133–40, 183–91, 192–200.

70. Trial Transcript, at pp. 182, 342.

71. S.F. Trial, Volume 20, testimony of Dr. Juan Contin, at pp. 28–37.

torso demonstrated Nicolas' his murder was intentional, rather than accidental, in nature.[72] The prosecution again emphasized Dr. Contin's "multiple blow" testimony during closing argument at the punishment phase of petitioner's trial.[73]

### 3. Petitioner's State Habeas Proceeding

In his first ground for state habeas relief, petitioner argued the prosecution withheld potentially exculpatory, mitigating, and impeaching evidence in the form of prosecution expert Dr. Harry Wilson's opinions that (1) all of Nicolas' injuries were consistent with a single, powerful, blow having been delivered to Nicolas' abdomen and (2) Nicolas' injuries were consistent with a syndrome he had observed in many infant-death cases in which an over-stressed care-giver simply "snaps" and lashes out at a child without premeditation.[74] In support of his Brady claim, petitioner also presented the state habeas court with an affidavit from Dr. Wilson in which Dr. Wilson stated, in pertinent part, as follows:

> After considering the evidence, including my own examination of the organs and tissues removed from the body of Nicolas Macias, the results of the autopsy performed on his body by the El Paso County Medical Examiner, and numerous photographs taken in connection with that autopsy, it *was my opinion that the injuries in question were inflicted on this child causing his death and that they were consistent with, and probably caused by a single violent blow to the child's abdomen.*
>
> As I stated in my original surgical report, and as I explained to the prosecuting

attorneys who solicited my opinion, the widespread damage to the child's organs was due to an combination of direct impact-related sheering and compression, as well as to a diffuse "ischemic" injury from extensive interference with normal organ and tissue blood supply to many sites. In other words, *I believed then, as I do now, that the multiple injuries to this child's abdomen were probably the result of a single violent blow to his anterior abdominal wall.* Of course I cannot say with certainty that multiple blows did not occur. *The lack of deep injury to the back and side external bruising sites strongly suggests that a single violent force applied broadly to the anterior abdominal wall created the multiple deep shearing and compressive injuries throughout the abdomen in a pattern consistent with the surface area of an adult shoe.* This lethal blunt force trauma could have been caused by a person stomping on the child's abdomen or violently striking the child's abdomen with a blunt object as he lay supine on the floor. *It is impossible to tell from the child's injuries the exact nature of the object with which he was struck.* From an evaluation of the multiple sites of the external bruising to the child's back, side, and stomach, and of the internal damage to his abdomen, *it is likely that all of his injuries were caused by a single blow.*[75]

> \* \* \* \* \* \*

> As far as I know, Dr. Contin did not review the surgically removed organs, microscopic slides, or, to the best of my knowledge, the pathology report that I had prepared when he reached his conclusion about multiple blows.[76]

> \* \* \* \* \* \*

---

72. S.F. Trial, Volume 23, at pp. 52–53, 78–80.

73. S.F. Trial, Volume 25, at p. 32.

74. State Habeas Transcript, at pp. 16–25.

75. State Habeas Transcript, at pp. 84–85 (emphasis added).

76. *Id.*, at p. 86.

The issue here is as follows: I am concerned that the prosecution's jury argument for this case represented that the infliction of multiple violent blows upon Nicolas Macias was an indication of Rigoberto Avila's intention to kill the child and the likelihood that he would be a continuing threat to society in the future. As a pediatric pathologist, I am often called upon to determine the cause of death of abused infants and children. In connection with my work, I have made a point to assess for my own purposes the setting and circumstances in which the child is abused by the alleged perpetrator. I do this to have a better knowledge of the potential psycho-social associations with the lethal event. From my first-hand knowledge of multiple case studies throughout the country involving the evaluation and courtroom testimony about lethal traumatic injuries to children, I am able to recognize common patterns of behavior on the part of the accused. While I always say that I don't know what is in someone's mind, it is my professional opinion that the type of violent trauma involved in cases like the killing of Nicolas Macias are the result of a sudden loss of control by the perpetrator, with unfortunate consequences for the perpetrator and victim alike.[77]

As to whether Rigoberto Avila actually acted intentionally or knowingly in the killing of this child, *it is my opinion, not having been previously asked,* that he must have known that a violent blow to a child would do great harm, but that in the moment of violence, he probably was not seeking to bring about this child's death, but was acting impulsively without an immediate thought for the consequences. What he did was, of course, dangerous, bad, and unacceptable, and I believe that he must have realized immediately after inflicting the injury that he had done a very bad thing. Accordingly, if asked my opinion as to whether the fatal injuries suffered by Nicolas Macias were inflicted intentionally, I would have expressed the opinion that they probably were not inflicted with the conscious objective to cause the death of Nicolas Macias. Rather, it is my opinion, as a pathologist and pediatrician with extensive clinical and courtroom experience involving injuries to children, that the fatal wounds suffered by Nicolas Macias were inflicted by a person who either did not perceive a risk of death to the child at the moment of the event or who consciously disregarded that risk. The nature of the child's injuries, the manner and circumstances under which I understand that they were inflicted, and the reported response of Rigoberto Avila to those injuries are all consistent with cases in which caretakers of children, under conditions of stress, lose control and act without reflection in a manner which endangers the safety of the infant or child under their care and control. I am willing to testify to these opinions in a court of law.[78]

In response to petitioner's state habeas corpus application, the State furnished the state habeas trial court with a pair of affidavits from the prosecuting attorneys in which they (1) swore they were unaware at the time of trial of Dr. Wilson's opinions regarding the possibility Nicolas Macias' injuries resulted from a single blow and (2) made no reference to the charts Dr. Wilson stated he had used to explain his one-

77. *Id.,* at pp. 86–87.

78. *Id.,* at pp. 87–88 (emphasis added).

blow theory to them.[79] The State also presented an affidavit from the former defense expert, Dr. Rodriguez, in which he stated as follows:

> I performed the second autopsy on Nicholas [sic] Macias. In attendance at the autopsy was Dr. Harry Wilson, another pathologist. Dr. Wilson and I discussed the cause of death of the child, Nicholas [sic] Macias, and Dr. Wilson told me that it was his opinion that the fatal injuries to Nicholas [sic] could have been caused by a single blow or they could have been caused by multiple blows. Dr. Wilson discussed his opinion with me at the time of the second autopsy.[80]

Inexplicably, the state habeas trial court did not hold an evidentiary hearing to resolve the conflicting assertions of Dr. Wilson and the prosecuting attorneys regarding their pretrial conversations about the cause of Nicolas' Macias' death or to develop the details of the conversation between Dr. Wilson and Dr. Rodriguez at the time of Nicolas' second autopsy. Instead, on June 28, 2004, the state habeas trial judge executed without any modification whatsoever, the State's proposed Order containing the court's Findings of Fact and Conclusions of Law.[81]

In support of its rejection on the merits of petitioner's *Brady* claim, the state habe-

---

**79.** More specifically, in pertinent part, the affidavit of prosecuting attorney George R. Locke states as follows:

> On approximately three occasions, I myself along with co-counsel, Gerald Cichon, and Investigator Ed Potterfield, met with Dr. Wilson. At the time of our first meeting with him, we had no idea of Dr. Wilson's opinion concerning Nicholas's [sic] injuries. It was Dr. Wilson who first told us that, in his opinion, Nicholas [sic] died from multiple blows, not a single blow. To my knowledge, Dr. Wilson never had the opinion that Nicholas's [sic] injuries were caused by a single blow until after trial. Dr. Wilson never disclosed that opinion to myself or any member of the prosecution team during the trial of the case. State Habeas Transcript, at p. 166.

The affidavit of the other prosecutor, Gerald Cichon, contains virtually identical language:

> On approximately three occasions, I myself along with co-counsel, George R. Locke, and Investigator Ed Potterfield, met with Dr. Wilson. At the time of our first meeting with him, we had no idea of Dr. Wilson's opinion concerning Nicholas's [sic] injuries. It was Dr. Wilson who first told us that, in his opinion, Nicholas [sic] died from multiple blows, not a single blow. To my knowledge, Dr. Wilson never had the opinion that Nicholas's [sic] injuries were caused by a single blow until after trial. During the punishment phase of the trial, I contacted Dr. Wilson and he still told me that he did not disagree that Nicholas [sic] could have sustained multiple blows at

or about the time of death. Dr. Wilson never stated to myself or any member of the prosecution team during the trial of the case that a single blow resulted in all injuries to Nicholas [sic]. State Habeas Transcript, at p. 169.

Curiously, the State also furnished the state habeas court with an affidavit from a third prosecutor within the El Paso County District Attorney's office who, from all appearances, had no involvement with petitioner's trial whatsoever. *See* Affidavit of Penny Hamilton, State Habeas Transcript, at p. 172 (explaining attorney Hamilton had no communications with Dr. Wilson regarding petitioner's case until after petitioner's trial).

**80.** State Habeas Transcript, at p. 174.

The State also furnished the state habeas trial court with an affidavit from petitioner's lead trial counsel but nothing in that document addressed the subject of Dr. Wilson's opinions. *See* Affidavit of Matthew Dekoatz, State Habeas Transcript, at pp. 176–77.

**81.** *Compare* Findings of Fact, Conclusions of Law, and Order, issued June 28, 2004 State Habeas Transcript, at pp. 217–28, with the State's proposed findings and conclusions found at State Habeas Transcript, at pp. 179–90. The state habeas trial court's findings and conclusions issued June 28, 2004 contain the same typographical misspelling of Nicolas Macias' first name that appeared in the affidavits accompanying the State's response to petitioner's state habeas corpus application.

as trial court made the following factual findings:

4. Before and during trial, the State was not aware of the opinion now expressed by Dr. Harry Wilson that a single blow caused the fatal injuries sustained by the victim, Nicholas [sic] Macias.

5. Because the State was not aware of the opinion now expressed by Dr. Harry Wilson that a single blow caused the fatal injuries sustained by the victim, Nicholas [sic] Macias, there was no failure on the part of the State to disclose that opinion to Avila.

6. The State designated Dr. Wilson as an expert because he was a witness in the case due to his work on the victim's medical case at or near the time of death.

7. The State did not designate Dr. Wilson as an expert to prevent him from being a witness for the defense and did not deprive Avila from [sic] calling Dr. Wilson as a witness or from discussing the case with him.

8. Avila knew of the opinion of Dr. Wilson concerning a single blow at the time of the second autopsy performed by Dr. Fausto Rodriguez, with Dr. Wilson in attendance, because Dr. Wilson discussed that opinion with Dr. Rodriguez at the time of the autopsy, and Dr. Rodriguez was a witness who testified on Avila's behalf.

9. Avila also knew about the single-blow opinion from Dr. Rodriguez, who testified to that opinion on behalf of Avila at trial.

10. Avila also knew of the single-blow opinion from Dr. Wilson's surgical report that he [had] access to before trial, and which report was utilized by his expert, Dr. Rodriguez.[82]

Further, the state habeas trial court issued the following conclusions ostensibly supporting its rejection of petitioner's *Brady* claim:

27. Because at the time of trial, the prosecution was not in possession of the opinion of Dr. Harry Wilson that the fatal injuries suffered by the victim. Nicholas [sic] Macias, were caused by a single blow, no *Brady* violation occurred.

28. Because Avila knew of and, indeed, put on evidence that he now claims was suppressed, namely, that the victim, Nicholas [sic] Macias, died from a single blow, no *Brady* violation was shown.

29. Avila has failed in his burden to show that the opinion of Dr. Wilson that the fatal injuries suffered by the victim. Nicholas [sic] Macias, resulted from a single blow was material, specifically, he has failed to demonstrate that it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure of Dr. Wilson's single-blow opinion.[83]

On September 29, 2004, the Texas Court of Criminal Appeals issued an unpublished, *per curiam,* Order expressly adopting the state trial court's findings and conclusions and denying state habeas relief. *Ex parte Rigoberto Avila,* App. No. 59,662–01 (Tex. Crim.App. September 29, 2004).

## C. AEDPA Review

### C.1. Clearly Established Federal Law

■ Few constitutional principles are more firmly established by Supreme Court precedent than the rule that " 'the suppression by the prosecution of evidence favorable to an accused upon request vio-

---

82. State Habeas Transcript, at p. 218.

83. State Habeas Transcript, at pp. 221–22.

lates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke,* 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004); *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *Gutierrez v. Dretke,* 392 F.Supp.2d 802, 850 (W.D.Tex.2005), *Certificate of Appealability denied,* 201 Fed.Appx. 196 (5th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1297, 167 L.Ed.2d 112 (2007). The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment, i.e., the rule announced in *Brady v. Maryland,* applies even when there has been no request by the accused. *Banks v. Dretke,* 540 U.S. at 690, 124 S.Ct. at 1272; *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). This duty also applies to impeachment evidence. *Strickler v. Greene,* 527 U.S. at 280, 119 S.Ct. at 1948; *United States v. Bagley,* 473 U.S. 667, 676 & 685, 105 S.Ct. 3375, 3380 & 3385, 87 L.Ed.2d 481 (1985).

■ Significantly for petitioner's case, the rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler v. Greene,* 527 U.S. at 280–81, 119 S.Ct. at 1948; *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995). "[T]he individual prosecutor has a duty to learn of any favorable evidence *known to the others acting on the government's behalf* in this case, including the police." *Strickler v. Greene,* 527 U.S. at 281, 119 S.Ct. at 1948 (emphasis added); *Kyles v. Whitley,* 514 U.S. at 437, 115 S.Ct. at 1567.

■ Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non-disclosure. *Banks v. Dretke,* 540 U.S. at 691, 124 S.Ct. at 1272; *Strickler v. Greene,* 527 U.S. at 281–82, 119 S.Ct. at 1948. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Banks v. Dretke,* 540 U.S. at 698–99, 124 S.Ct. at 1276.

■ The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does *not* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383 (expressly adopting the "prejudice" prong of the *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*). Second, the materiality standard is *not* a sufficiency of the evidence test. *Kyles v. Whitley,* 514 U.S. at 434–35, 115 S.Ct. at 1566. Third, once materiality is established, harmless error analysis has no application. *Kyles v. Whitley,* 514 U.S. at 435–36, 115 S.Ct. at 1566–67. Finally, materiality must be assessed collectively, not item by item. *Kyles v. Whitley,* 514 U.S. at 436–37, 115 S.Ct. at 1567.

 C.2. *State Habeas Court's Faulty Factual Findings and Erroneous Legal Conclusions Regarding the Suppression and Favorable Nature of Dr. Wilson's Opinions*

There are two fundamental problems with the Texas Court of Criminal Appeals'

rejection on the merits of petitioner's *Brady* claim. First, the state habeas court employed the wrong legal standard to review and evaluate petitioner's *Brady* claim. Second, the state habeas court's factual findings are not only rebutted by the clear and convincing evidence currently before this Court but those findings had no evidentiary basis whatsoever in the record before the state habeas court. While the state habeas trial court offered multiple, contradictory and even mutually exclusive, theories as to why petitioner's *Brady* claim lacked merit, those theories not only lacked evidentiary support in the record before the state habeas court but were premised on a fundamental misunderstanding of Supreme Court precedent.

 A petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan,* —— U.S. at ——, 127 S.Ct. at 1939–40; *Rice v. Collins,* 546 U.S. at 338, 126 S.Ct. at 974; *Miller–El v. Dretke,* 545 U.S. at 240, 125 S.Ct. at 2325; 28 U.S.C. § 2254(e)(1).

 However, the deference to which the state habeas court's factual findings are entitled under the AEDPA does not compel this Court to accept illusory factual findings which were essentially cut from whole cloth. *See Miller–El v. Cockrell,* 537 U.S. at 340, 123 S.Ct. at 1041 ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review."). Likewise, this Court's federal habeas review of the state court's application of federal constitutional principles includes the duty to ascertain whether the state habeas court acted in a manner contrary to clearly established federal law or applied clearly established federal law in an objectively unreasonable manner. *Schriro v. Landrigan,* 127 U.S.

at ——, 127 S.Ct. at 1939; *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1438.

 When, as here, a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, a federal court must then resolve the claim without the deference the AEDPA otherwise requires. *Panetti v. Quarterman,* —— U.S. ——, ——, 127 S.Ct. 2842, 2858, —— L.Ed.2d —— (2007). In denying petitioner's *Brady* claim, the state habeas court disregarded clearly established principles of federal constitutional law and made factual findings to support its conclusions which were utterly without evidentiary basis in the record before it. Therefore, this Court's disposition of petitioner's *Brady* claim is not constrained by the highly deferential standards applicable under ordinary AEDPA review. *Id.*

### 2.a. *Dr. Wilson Actually Assisted the Prosecution*

The initial errors committed by the state habeas court were its erroneous factual determinations (and resulting erroneous legal conclusion) that Dr. Harry Wilson was not a part of the State's prosecution team. From this faulty premise, the state habeas court reasoned Dr. Wilson's expert opinion regarding the possibility a single blow caused Nicolas Macias' death was not "known" to the prosecution prior to or during trial. These unsupportable factual findings are entwined with, and culminated in, an equally unsupportable legal conclusion.

Long before petitioner's trial, the Supreme Court clearly held (1) the rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor, *Strickler v. Greene,* 527 U.S. at 280–81, 119 S.Ct. at 1948; *Kyles v. Whitley,* 514 U.S. at 438, 115 S.Ct. at 1568; and (2) prosecutors have a duty "to learn of any favorable evidence

*known to the others acting on the government's behalf* in this case, including the police." *Strickler v. Greene*, 527 U.S. at 281, 119 S.Ct. at 1948 (emphasis added); *Kyles v. Whitley*, 514 U.S. at 437, 115 S.Ct. at 1567.

A cursory review of the record from petitioner's trial proceedings reveals the prosecution informed the trial court and defense counsel in April, 2000 (almost a year before petitioner's trial began) that it would be contacting Dr. Harry Wilson for the express purpose of securing his professional services to assist the prosecution.[84] Subsequently, the prosecution filed not less than eight separate advisories with the trial court advising the trial court and defense counsel the prosecution intended to call Dr. Wilson as both a fact witness *and* an expert witness.[85] The affidavits of prosecutors George Locke and Gerald Cichon presented to the state habeas court established beyond any doubt those attorneys actually consulted with Dr. Wilson prior to petitioner's trial. The prosecutors' affidavits also established Dr. Wilson furnished them with expert opinions regarding the cause of Nicolas Macias' death.[86] Dr. Wilson's affidavit presented to the state habeas court (uncontradicted in pertinent part by any other evidence before the state habeas court) established that (1) he actually consulted with both prosecuting attorneys, (2) he did not believe the prosecution's expert, Dr. Contin, had reviewed all of the evidence to which Dr. Wilson had access, and (3) prior to petitioner's trial, Dr. Wilson was prepared to testify not only to his opinion that Nicolas Macias

probably died as a result of a single, violent, abdominal blow but also to testify Nicolas' death was consistent with other deaths he had personally observed or learned of in which a child's care giver engaged in deadly, albeit unpremeditated, violent conduct.[87] Finally, prosecutor Cichon's affidavit establishes he contacted Dr. Wilson *during petitioner's trial* to again discuss the cause of Nicolas' death.[88]

Therefore, the state habeas court's factual finding that Dr. Wilson was *not* part of the prosecution team is simply erroneous. That finding is completely rebutted by the uncontradicted evidence before the state habeas court and further evidences the state habeas court's objectively unreasonable application of clearly established Supreme Court precedent. The state habeas court disregarded the Supreme Court's clear holdings in *Strickler v. Greene*, and *Kyles v. Whitley*, which make prosecutors responsible for disclosing to defense counsel not merely all information favorable to the defense that is within the prosecutors' personal knowledge but all such evidence favorable to the defense which is known to any person acting on behalf of the prosecution. Dr. Wilson cleared acted on behalf of the prosecution in connection with petitioner's capital murder trial. He was nothing less than the prosecution's consulting expert.

Furthermore, in his affidavit submitted to this Court, Dr. Wilson avers he was contacted by the El Paso District Attorney's Office, asked to attend Nicolas' second autopsy as a representative of that

---

84. Trial Transcript, at pp. 60–61.

85. Trial Transcript, at p. 123–30, 133–40, 183–200.

86. *See* note 79 *supra.*

87. *See* notes 75–78, *supra,* and accompanying text.

88. Affidavit of Gerald Cichon, State Habeas Transcript, at p. 169.

office, and did so in that capacity.[89] Respondent has not challenged the factual accuracy of these assertions.

Insofar as respondent argues this Court should disregard Dr. Wilson's federal affidavit because it was not presented to the state habeas court, three observations are appropriate.

■ First, it is well-settled in this Circuit that dismissal of federal habeas claims is not necessary where the petitioner seeks to support his claims with new evidence, including affidavits, which merely supplements, rather than fundamentally alters, the claim presented to the state court. *Moore v. Quarterman*, 454 F.3d 484, 491 (5th Cir.2006); *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir.2005); *Anderson v. Johnson*, 338 F.3d 382, 386–89 (5th Cir.2003). The *Brady* claim petitioner fairly presented to the state habeas court was remarkably detailed in terms of both its evidentiary and legal support. Dr. Wilson's federal affidavit supplements his averments in his original affidavit with additional details which do not fundamentally alter the nature of petitioner's fully exhausted *Brady* claim.

Second, petitioner undertook all reasonably necessary steps for obtaining an evidentiary hearing before the state habeas court where any and all ambiguities in the affidavits of Dr. Wilson and the prosecuting attorneys could have been resolved on a full evidentiary basis. The State denied petitioner's requests for an evidentiary hearing without offering any rational justification for that decision. *See Anderson v. Johnson*, 338 F.3d at 388–89 (declining to dismiss an ineffective assistance claims supported by new affidavits where the petitioner's failure to develop the facts in support of his claim at the state level was not the result of the petitioner's lack of diligence or an intentional withholding of evidence from the state forum).

Finally, the only "new" information contained in Dr. Wilson's federal affidavit addresses a series of purported "factual findings" made by the state habeas court which find no evidentiary support in the record before the state habeas court and which either distorted or deliberately misconstrued the contents of Dr. Wilson's state affidavit. *See Moore v. Quarterman*, 454 F.3d at 491–93 (contrasting the situation in Moore's case—where the petitioner's initial assertions of mental retardation in state court had been conclusory at best—with the highly detailed factual and legal assertions made by Morris); *Morris v. Dretke*, 413 F.3d at 492–98(even where new evidence places a federal constitutional claim in a comparatively stronger evidentiary posture than it was in state court, disregard of same is unwarranted where the fundamental nature of the claim is unaltered by the new evidence); *Anderson v. Johnson*, 338 F.3d at 386–89 (holding although a habeas petitioner will be allowed to present "bits of evidence" to a federal court that were not presented to the state court, new evidence that places claims in a significantly different legal posture must first be presented to the state courts). Dr. Wilson's federal affidavit did not place petitioner's *Brady* claim in a comparatively stronger evidentiary posture. It merely emphasizes the already patently erroneous nature of the state habeas court's factual findings.

Under such circumstances, it is not inappropriate for this Court to consider the clarifying character of Dr. Wilson's federal affidavit.

---

**89.** Affidavit of Dr. Harry L. Wilson, M.D., attached as Appendix A to Petition, at p. 3.

Henceforth, this Court will refer to this affidavit as Dr. Wilson's *federal* affidavit.

### 2.b. Prosecutors' Personal Knowledge Irrelevant

■ Under clearly established federal law, the state habeas court's findings and conclusions regarding the prosecutors' alleged lack of personal knowledge of Dr. Wilson's exculpatory and mitigating opinions are *non sequitur*. As an expert witness retained by the prosecution with whom the prosecution actually consulted, and on whom the prosecutors admit they relied in formulating their trial strategy, all of Dr. Wilson's exculpatory and mitigating expert opinions, as well as all expert opinions and personal knowledge of Dr. Wilson which could have been used to impeach prosecution witnesses at petitioner's trial, were subject to disclosure under *Brady*. *Strickler v. Greene*, 527 U.S. at 280–81, 119 S.Ct. at 1948; *Kyles v. Whitley*, 514 U.S. at 437–38, 115 S.Ct. at 1567–68. These included (1) Dr. Wilson's expert opinion that Nicolas' death could have resulted from a single blow to the abdomen, (2) Dr. Wilson's personal knowledge regarding the condition of Nicolas' abdomen which Dr. Wilson observed during Nicolas' second autopsy, (3) Dr. Wilson's personal knowledge regarding the failure of prosecution expert Dr. Contin to review either the tissue samples Dr. Wilson had reviewed or Dr. Wilson's surgical report, and (4) Dr. Wilson's professional opinion that Nicolas' fatal injuries could have resulted from a blow administered by a care giver who was acting without the intent to kill.

It matters not whether the two individual prosecutors who tried petitioner's capital case were personally aware Dr. Wilson possessed personal knowledge or expert opinions which could have been used to impeach Dr. Contin's multiple-blow opinion or to mitigate the aggravating circumstances of petitioner's crime. The Supreme Court's holdings in *Strickler v. Greene* and *Kyles v. Whitley* make clear the prosecution had a constitutional duty to learn of and disclose any favorable evidence *known to the others acting on the government's behalf* in petitioner's case. *Strickler v. Greene*, 527 U.S. at 281, 119 S.Ct. at 1948; *Kyles v. Whitley*, 514 U.S. at 437, 115 S.Ct. at 1567.

As an expert with whom both prosecuting attorneys actually consulted prior to petitioner's trial (and with whom prosecutor Cichon claimed he had consulted *during* trial), Dr. Wilson clearly fell within the scope of persons "acting on the government's behalf" for purposes of the constitutional duty imposed by Brady. The state habeas court's factual findings and legal conclusions to the contrary constituted unreasonable determinations of the facts from the evidence before that court and culminated in an objectively unreasonable application of clearly established federal constitutional law.

### 2.c. Prosecutors' Good Faith Irrelevant

The state habeas court's factual findings that the individual prosecutors did not intentionally or deliberately "withhold" Dr. Wilson's favorable opinions, either by designating him as an expert or instructing him not consult with petitioner's trial counsel, are equally irrelevant for purposes of federal habeas review of petitioner's *Brady* claim.

■ The duty imposed by *Brady* is not merely a negative prohibition against the prosecution's active concealment of exculpatory, mitigating, or impeachment evidence; it imposes an affirmative duty on the prosecution to disclose to the defense all such evidence in the possession of those "acting on the government's behalf." *Strickler v. Greene*, 527 U.S. at 281, 119 S.Ct. at 1948; *Kyles v. Whitley*, 514 U.S. at 437, 115 S.Ct. at 1567. This duty applies with equal force regardless of whether the prosecution's failure to disclose was

negligent or malicious. *See Banks v. Dretke,* 540 U.S. at 691, 124 S.Ct. at 1272 (" 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' "); *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196–97 (holding the same).

The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment applies even when there has been no request by the accused. *Banks v. Dretke,* 540 U.S. at 690, 124 S.Ct. at 1272; *Strickler v. Greene,* 527 U.S. at 280, 119 S.Ct. at 1948; *United States v. Agurs,* 427 U.S. at 107, 96 S.Ct. at 2399.

Petitioner's prosecutors were constitutionally obligated to inquire whether their own experts possessed personal knowledge or expert opinions which were favorable to the defense. There is no genuine issue of material fact regarding their abject failure to do so in the case of Dr. Wilson, their consulting expert. In the context of this Court's analysis of petitioner's *Brady* claim, the prosecutors' protests of personal ignorance regarding Dr. Wilson's opinions and personal knowledge favorable to the defense are utterly *non sequitur.*

### 2.d. *Petitioner Had No Notice of Dr. Wilson's Opinions*

The uncontradicted evidence before the state habeas court established beyond doubt that the prosecution actually consulted with Dr. Wilson. Critically, it establishes that, prior to petitioner's trial, Dr. Wilson possessed both personal knowledge and professional opinions which would have (1) impeached the opinion of

prosecution expert Dr. Contin regarding how many blows had caused Nicolas' Macias' fatal injuries, (2) undermined the reliability of Dr. Contin's opinion as to the cause of Nicolas' death, (3) substantially corroborated defense expert Dr. Rodriguez's opinion regarding the cause of Nicolas' death, and (4) furnished mitigating evidence in the form of expert opinion testimony offering a rational explanation for an otherwise incomprehensibly violent act against a defenseless 19–month–old child. The evidence before the state habeas court also established the prosecution never made any effort to inform or advise the defense prior to or during trial of any of Dr. Wilson's exculpatory, mitigating, or impeaching opinions and personal knowledge.

The state habeas court attempted to avoid the obvious legal implications of the foregoing facts by "finding" (1) Dr. Wilson discussed his single-blow theory with Dr. Rodriguez at the time of Nicolas' second autopsy, (2) Dr. Rodriguez, the defense expert, was thus aware of the "single-blow theory," and (3) petitioner was made aware of the single-blow theory by virtue of Dr. Wilson's written surgical report which was furnished to defense counsel prior to trial.[90] The record now before this Court establishes without any doubt that these findings were utterly without evidentiary support in the record before the state habeas court and are unequivocally rebutted by a wealth of clear and convincing evidence now before this Court.

### 2.d.(1) *Dr. Wilson Had Not Yet Concluded Anything Regarding the Cause of Nicolas' Death at the Time of the Second Autopsy*

There was no evidence before the state habeas court from which a rational fact-

---

**90.** State Habeas Transcript, at p. 218. These "factual findings" are set forth in numbered paragraphs 8–10 of the state habeas trial court's Order, which was signed March 10, 2004 but not filed of record until June 28, 2004.

finder could have determined that, at the time of Nicolas' second autopsy, Dr. Wilson communicated to Dr. Rodriguez a firm opinion that Nicolas' death had resulted from a single blow to Nicolas' abdomen. No such assertion is contained in Dr. Wilson's state affidavit. At trial, Dr. Rodriguez testified only that Dr. Wilson had been present during Nicolas' second autopsy.[91] The affidavit of Dr. Rodriguez which the State presented to the state habeas court stated in pertinent part only that, at the time of Nicolas' second autopsy, Dr. Wilson advised Dr. Rodriguez that he (Dr. Wilson) believed Nicolas' fatal injuries could have been caused by *either* multiple blows or a single blow.[92]

Dr. Wilson's federal affidavit explains that, at the time of Nicolas' second autopsy, he had not reached any conclusion as to whether Nicolas' fatal injuries had resulted from a single blow or multiple blows. The state habeas court had no evidence to the contrary before it. Respondent furnished the state habeas court with no evidence establishing precisely when Dr. Wilson first concluded Nicolas' fatal injuries could have resulted from a single blow.

Likewise, the respondent furnished the state habeas court with no other evidence whatsoever establishing that anyone ever advised defense counsel of Dr. Wilson's additional opinions and personal knowledge favorable to the defense regarding (1) Dr. Contin's failure to review Dr. Wilson's pathological report before formulating his multiple-blow theory or (2) the similarity between Nicolas' fatal injuries and those common in incidents of unintentional care giver rage with which Dr. Wilson had personal experience. On the contrary, the state habeas court had before it the uncontradicted state affidavit of Dr. Wilson in

which he explained he formulated his single-blow opinion only after "long, careful, and deliberate thought, undertaken at the request of the prosecuting attorneys."[93] Nothing in Dr. Wilson's affidavit or the other evidence before the state habeas court established that Dr. Wilson ever expressed an opinion to Dr. Rodriguez (or any other member of the defense team) that, in fact, Nicolas' fatal injuries were the product of a single, violent, blow to the abdomen.

Thus, there was no evidentiary support in the state habeas proceedings for the state habeas court's factual finding that, at the time of the second autopsy, Dr. Wilson advised Dr. Rodriguez that Dr. Wilson believed Nicolas' fatal injuries had resulted from a single, violent, blow to the abdomen.

In his federal affidavit, Dr. Wilson confirms what is obvious from a review of his surgical report—that he had not reached a firm conclusion regarding the cause of Nicolas' death at the time. He explains (1) he was asked by the El Paso District Attorney's Office to attend Nicolas' second autopsy as a representative of that office and did so in that capacity, (2) at the time of the second autopsy, both he and Dr. Rodriguez discussed the fact that Nicolas had sustained extensive injuries and that, because of this fact, it would make it difficult to determine whether Nicolas' injuries had been caused by a single blow or multiple blows, (3) neither Dr. Wilson nor Dr. Rodriguez reached any opinion at that time regarding the precise mechanism Nicolas' injuries (a single blow or multiple blows) and their comments to each other expressed their uncertainty on that point, (4) sometime later, the El Paso County

---

91. S.F. Trial, Volume 22, testimony of Fausto Rodriguez, at pp. 12, 16, 17.

92. State Habeas Transcript, at p. 174.

93. State Habeas Transcript, at p. 85.

District Attorney's Office approached Dr. Wilson and requested him to determine the circumstances of Nicolas' death, (5) over a period of subsequent months, Dr. Wilson carefully studied Nicolas' injuries and eventually concluded Nicolas' injuries were probably caused by a single violent blow to the abdomen, (6) Dr. Wilson reported his conclusions to the prosecution and showed the prosecutors diagrams he had developed demonstrating how Nicolas' injuries could have resulted from a single, violent, blow to the abdomen, (7) the prosecutors displayed an overt lack of enthusiasm for Dr. Wilson's conclusions but nonetheless informed Dr. Wilson he would be called to testify at petitioner's trial, (8) Dr. Wilson was surprised when he was not called to testify at petitioner's trial, and (9) Dr. Wilson was even more surprised when he read press accounts of petitioner's trial reporting the prosecution had presented evidence and argued to the jury that petitioner had repeatedly kicked Nicolas Macias.[94]

Respondent has presented neither the state habeas court nor this Court with any evidence establishing that, at the time of Nicolas' second autopsy, Dr. Wilson possessed or expressed an opinion regarding the cause of Nicolas' fatal injuries probably being a single blow to Nicolas' abdomen. On the contrary, Dr. Wilson's federal affidavit, uncontradicted by any other evidence now before this Court, establishes Dr. Wilson did not reach any conclusion regarding the likely cause of Nicolas' fatal injuries until many months *after* Nicolas' second autopsy.

Accordingly, the clear and convincing evidence now before this Court conclusively rebuts the state habeas court's purported "factual finding" that Dr. Wilson expressed a "single-blow" opinion to Dr. Rodriguez at the time of Nicolas' second autopsy. Petitioner has successfully overcome the presumption of correctness afforded that erroneous factual finding.

2.d.(2) *Dr. Wilson's Opinions Were Neither Cumulative nor Duplicative of Dr. Rodriguez's Opinions*

The state habeas court also made factual findings and legal conclusions suggesting Dr. Wilson's single-blow opinion was merely cumulative of Dr. Rodriguez's similar conclusions. These findings and conclusions ignored the wealth of clear and convincing evidence before the state habeas court establishing that Dr. Wilson possessed relevant opinions and personal knowledge on far more subjects than merely the cause of Nicolas' fatal injuries. Dr. Wilson's state affidavit established that he was ready, willing, and able at the time of petitioner's trial to (1) impeach Dr. Contin's trial testimony by pointing out Dr. Contin had not reviewed the tissue slides or other available forensic evidence to which Dr. Wilson had obtained access, (2) express a professional opinion that Nicolas' injuries were consistent with a pattern of violent, albeit unpremeditated, care giver assaults on children he had observed during his many years as a practicing pediatric pathologist, and (3) offer a professional opinion in support of the defense's single-blow theory which was based on considerably more years of experience than those possessed by Dr. Rodriguez. In sum, Dr. Wilson's state affidavit established Dr. Wilson was prepared to offer a plethora of exculpatory, impeaching, and mitigating evidence far beyond the single-blow opinion expressed by Dr. Rodriguez at petitioner's trial.

Furthermore, the quality of Dr. Wilson's expert opinions was significantly different from those opinions expressed at trial by

94. Affidavit of Dr. Harry L. Wilson, attached as Appendix A to Petition, at pp. 2–7.

Dr. Rodriguez. At trial, the prosecution attacked Dr. Rodriguez's opinions by pointing to his lack of experience. In contrast, Dr. Wilson could have offered petitioner's jury something Dr. Rodriguez could not—professional opinions based on decades of experience as a pediatric pathologist. There were light years of difference between Dr. Rodriguez's three years of experience and the decades of experience Dr. Wilson would have been able to rely upon when expressing his single-blow opinion.

Even more significantly, Dr. Wilson's federal affidavit establishes he was prepared to support his single-blow opinion regarding the cause of Nicolas' fatal injuries with diagrams he had prepared and shown to the prosecutors which visually demonstrated how he had reached his conclusion that Nicolas' fatal injuries resulted from a single, violent, blow to the abdomen. The record now before this Court establishes by clear and convincing evidence that Dr. Wilson possessed opinions and personal knowledge regarding the circumstances of Nicolas' injuries and *other relevant subjects* which far surpassed the trial testimony of Dr. Rodriguez. Dr. Wilson also possessed decades more experience in the field of pediatric pathology than did Dr. Rodriguez.

Respondent's argument that Dr. Wilson's opinions merely "duplicate" the single-blow opinion Dr. Rodriguez expressed during petitioner's trial ignores the vastly broader content and more experienced character of the opinions Dr. Wilson was prepared to express at petitioner's trial had the prosecution fulfilled its constitutional obligation to advise defense counsel of same.

Thus, the state habeas court's purported factual findings and related legal conclusions suggesting Dr. Wilson's opinions were merely cumulative of Dr. Rodriguez's opinion testimony at petitioner's trial are rebutted by clear and convincing evidence now before this Court. Petitioner has successfully overcome the presumption of correctness afforded that purported factual finding.

2.d.(3) *Nothing in Dr. Wilson's Surgical Report Alerted the Defense to Any of Dr. Wilson's Opinions Regarding the Cause of Nicolas' Death or Dr. Wilson's Other Opinions*

The clear and convincing evidence now before this Court completely rebuts the state habeas court's erroneous factual finding that Dr. Wilson's opinions favorable to the defense were disclosed to petitioner's trial counsel when Dr. Wilson's surgical report was made available for inspection prior to trial.

As explained in Dr. Wilson's federal affidavit, in the course of Dr. Raschbaum's heroic but ultimately unsuccessful surgical efforts to save Nicolas' life, tissue was removed from various abdominal injury sites and submitted to Dr. Wilson for examination and evaluation. Dr. Wilson subsequently prepared a written report concerning his findings and conclusions based on his microscopic examination of those tissue samples. Dr. Wilson's report concluded Nicolas had sustained widespread damage to his organs due to a combination of impact-related sheering and compression, along with diffuse "ischemic" injury resulting from extensive interference with normal organ and tissue blood supply to many sites, i.e., Nicolas sustained injuries to a widespread area of his abdomen both as a result of the direct impact on his body as well as the traumatic tearing of many blood vessels which disrupted the normal flow of blood to Nicolas' abdominal organs

and tissues.[95]

Even a cursory review of Dr. Wilson's surgical report amply demonstrates Dr. Wilson offered no opinion or suggestion therein regarding the cause of Nicolas' fatal injuries. The state habeas court's factual finding that defense counsel were alerted to Dr. Wilson's "single-blow" opinion by virtue of their access to Dr. Wilson's surgical report is completely rebutted by examination of the report itself. The report simply did not address the cause of Nicolas' fatal injuries; it merely recites what Dr. Wilson found when he microscopically examined slides of tissue taken from various injury sites within Nicolas' abdomen. Likewise, nothing in Dr. Wilson's report offered any clue to the wealth of exculpatory, mitigating, or impeaching testimony Dr. Wilson was prepared to offer on other subjects at petitioner's trial.

It should also be noted Dr. Wilson's surgical report was *never admitted* into evidence during pretrial proceedings or during petitioner's trial. Nor was Dr. Wilson's surgical report offered or admitted into evidence during petitioner's state habeas corpus proceeding. Thus, the state habeas court made its erroneous factual finding regarding the contents of Dr. Wilson's surgical report without ever having actually reviewed the report in question.

In his federal affidavit, Dr. Wilson explains in clear and convincing terms that he had not formulated an opinion regarding the cause of Nicolas' death at the time he prepared his surgical report because that report addressed only his findings made from microscopic examination of slides of tissue.

Thus, the state habeas court's factual finding that Dr. Wilson's opinion regarding the cause of Nicolas' fatal injuries was disclosed to petitioner's defense counsel through disclosure of Dr. Wilson's surgical report is a total fallacy. The state habeas court did not have a copy of Dr. Wilson's surgical report before it when it made that patently erroneous factual determination. Furthermore, this Court's independent review of Dr. Wilson's surgical report reveals it contains absolutely no clue as to Dr. Wilson's opinion regarding the cause of Nicolas' fatal injuries. Nothing in Dr. Wilson's surgical report implies, suggests, or hints that Dr. Wilson was *also* prepared to offer a wide range of testimony which could have helped petitioner's trial counsel impeach Dr. Contin's trial testimony, suggest a rational explanation for petitioner's violent outburst, or argue petitioner's murderous conduct had been unintentional.

Far from suggesting a single blow caused Nicolas' fatal injuries, Dr. Wilson's surgical report emphasized the extensive nature of Nicolas' internal injuries. As respondent candidly admits, Dr. Wilson's surgical report does not reveal or suggest a "single-blow" opinion as to Nicolas' cause of death.[96] Nor does Dr. Wilson's surgical report offer any clue as to the wealth of additional exculpatory, mitigating, and impeaching evidence Dr. Wilson could have furnished petitioner's trial counsel. Under such circumstances, petitioner has overcome the presumption of correctness afforded the state habeas court's purported factual finding that petitioner's defense counsel were alerted to Dr. Wilson's opinions by virtue of their access to Dr. Wilson's surgical report.

---

**95.** A copy of Dr. Wilson's surgical report, dated March 1, 2000, is attached to Dr. Wilson's latest affidavit, collectively attached as Appendix A to Petition.

**96.** Respondent's Original Answer, filed February 1, 2006, docket entry no. 24, at p. 21.

### 3. Synthesis

#### 3.a. Dr. Wilson's Suppressed Opinions were Favorable to the Defense

█ For the reasons set forth above (i.e., because he was clearly a member of the prosecution team in connection with petitioner's trial), as a matter of federal constitutional principle petitioner's prosecutors were charged with disclosing to petitioner's defense counsel (1) Dr. Wilson's personal knowledge and professional opinion regarding the probable cause of Nicolas' death (i.e., the single-blow theory), (2) Dr. Wilson's observations regarding the failure of Dr. Contin to review microscopic tissue slides and other physical evidence actually reviewed by Dr. Wilson, and (3) Dr. Wilson's opinion regarding the possibility Nicolas' fatal injuries were consistent with a recognized syndrome of unpremeditated, violent, conduct toward children by care givers. All three of the foregoing subjects constituted favorable exculpatory, impeaching, and mitigating information.

The evidence now before this Court establishes beyond any doubt that none of the foregoing information was disclosed to petitioner's defense counsel prior to trial. It matters not whether the prosecution's failure to disclose Dr. Wilson's exculpatory, impeaching, or mitigating opinions resulted from malice or negligence on the part of the individual prosecuting attorneys. The first two prongs of petitioner's *Brady* claim have been satisfied by clear and convincing evidence now before this Court.

#### 3.b. Materiality

#### 3.b.(1) The Issues before this Court

In its Order issued June 28, 2004, the state habeas trial court concluded as follows:

29. Avila has failed in his burden to show that the opinion of Dr. Wilson that the fatal injuries suffered by the victim. Nicholas [sic] Macias, resulted from a single blow was material, specifically, he has failed to demonstrate that it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure of Dr. Wilson's single-blow opinion.[97]

The fundamental analytical problem with the state habeas court's lone legal conclusion regarding the materiality of Dr. Wilson's opinion as to the cause of Nicolas' death is: it wholly ignored both the mitigating and impeaching value of Dr. Wilson's other available testimony regarding (1) Dr. Contin's failure to examine all of the physical evidence Dr. Wilson had reviewed and (2) the likelihood petitioner's violent conduct was consistent with a recognized syndrome of violent, albeit unpremeditated, conduct by care givers toward children.

The question before the state habeas court was not solely whether Dr. Wilson's opinion as to the cause of Nicolas' death was "material" within the meaning of *Brady* but, rather, whether the entirety of Dr. Wilson's personal knowledge and professional opinions satisfied the materiality prong of *Brady*. The critical question was whether there was a reasonable probability that, but for the failure of the prosecution to disclose to petitioner's trial counsel the entirety of Dr. Wilson's relevant personal knowledge and professional opinions, the outcome of either phase of petitioner's trial would have been different. *See Banks v. Dretke*, 540 U.S. at 698–99, 124 S.Ct. at 1276 (holding evidence is "material" under *Brady* where there exists a "reasonable probability" that, had the evidence been disclosed, the result at trial would

---

**97.** State Habeas Transcript, at pp. 221–22.

have been different); *Dickson v. Quarterman,* 462 F.3d 470, 477 (5th Cir.2006)(evidence is material where there exists a reasonable probability that, had it been disclosed, the result at trial would have been different).

■ In reviewing the state habeas court's conclusions regarding petitioner's failure to satisfy the materiality prong of the *Brady* test, this Court must review the state habeas court's ultimate conclusion, not the quality of the reasoning (or lack thereof) contained in the state habeas trial court's Order recommending denial of state habeas relief or the Texas Court of Criminal Appeals' *per curiam* Order adopting the trial court's findings, conclusions, and recommendation that state habeas relief be denied. *St. Aubin v. Quarterman,* 470 F.3d at 1100; *Amador v. Quarterman,* 458 F.3d at 410; *Garcia v. Quarterman,* 454 F.3d 441, 444 (5th Cir. 2006); *Pondexter v. Dretke,* 346 F.3d at 148; *Neal v. Puckett,* 286 F.3d at 246.

Moreover, the AEDPA limits this Court's review to a determination not merely of whether the state habeas court's ultimate conclusion was correct but, rather, whether the state court's ultimate conclusion was objectively reasonable. *See Schriro v. Landrigan,* —— U.S. at ——, 127 S.Ct. at 1939 ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Price v. Vincent,* 538 U.S. at 641, 123 S.Ct. at 1853 (it is the habeas applicant's burden to show that the state court applied clearly established federal law to the facts of his case in an objectively unreasonable manner); *Moody v. Quarterman,* 476 F.3d 260, 271–72 (5th Cir.2007)(denying federal habeas relief despite state court's erroneous ruling on *Batson* claim because the prosecutor's prof-

fered reasons for exercising a peremptory challenge were at least facially reasonable, thus rendering objectively reasonable the state court's ultimate conclusion rejecting the *Batson* claim), *cert. filed May 14, 2007, 06–11338; Foster v. Quarterman,* 466 F.3d 359, 368 (5th Cir.2006)("A decision is *not* unreasonable merely because it is incorrect; to be unreasonable, it must be both incorrect *and* objectively unreasonable."), *cert. denied,* —— U.S. ——, 127 S.Ct. 2099, 167 L.Ed.2d 817 (2007); *Dickson v. Quarterman,* 462 F.3d at 477–80 (holding objectively reasonable a state court's rejection of a Brady claim based on the state court's objectively reasonable conclusion other evidence demonstrating the defendant's intent to kill rendered the undisclosed evidence immaterial); *Garcia v. Quarterman,* 456 F.3d 463, 466 (5th Cir.2006)(recognizing an unreasonable application of federal law is different from an incorrect application of federal law and, as such, the state court's application of federal law must be objectively unreasonable, as opposed to merely incorrect, for federal habeas relief to be granted); *Coble v. Dretke,* 444 F.3d 345, 350 (5th Cir.2006) ("A state court's incorrect application of clearly established Supreme Court precedent is not enough to warrant federal habeas relief; in addition, such an application must also be unreasonable.").

Because the factual issues facing the jury at each phase of petitioner's capital trial were distinctly different, separate inquiry of the materiality prong of Brady is necessary for each phase of petitioner's trial.

### 3.b.(2) *Guilt–Innocence Phase of Trial*

The question before the jury at the guilt-innocence phase of petitioner's capital trial was whether the evidence established beyond a reasonable doubt that the petitioner had intentionally killed Nicolas Ma-

cias by striking Nicolas with his foot, as charged in the indictment against petitioner.

As explained above, the evidence presented by the prosecution at the guilt-innocence phase of trial was largely circumstantial: petitioner was the only adult with access to Nicolas at the time Nicolas sustained his fatal abdominal injuries; every expert who examined Nicolas' before or after his death agreed those injuries were quite extensive, would have been immediately incapacitating, and resulted from the application of considerable violent force; petitioner offered no rational explanation for how Nicolas sustained those injuries; petitioner apparently attempted to page Nicolas' mother several minutes before petitioner telephoned 911 for help; and when questioned at the scene by emergency medical personnel, petitioner said Nicolas' mouth had been covered by his four-year-old brother Dylan while they were playing but made no mention of any blunt force trauma to Nicolas' abdomen. The only direct evidence of petitioner's guilt came from petitioner's highly inculpatory second written statement to the police, admitted into evidence as State Exhibit no. 2, and the then-five-year-old Dylan, who testified he had seen petitioner step on Nicolas. There was no evidence admitted during the guilt-innocence phase of petitioner's trial establishing a motive for petitioner's murder of Nicolas. However, Dr. Contin did express his opinion that Nicolas had been struck multiple times in the abdomen and back.

The defense offered the expert testimony of Dr. Rodriguez to the effect that (1) Nicolas did not display signs of systematic child abuse, (2) all of Nicolas' fatal abdominal injuries could have been caused by a single, violent, blow to Nicolas' abdomen, possibly applied by a foot, and (3) the possibility existed that Nicolas' fatal injuries had been accidentally inflicted. Rather than supporting Dr. Rodriguez's suggestion of an accidental injury, however, petitioner insisted throughout his trial testimony that he had neither struck nor stepped on Nicolas.

Dr. Wilson could have furnished petitioner's trial counsel with expert opinion testimony suggesting (1) all of Nicolas' fatal injuries resulted from a single, violent, blow to Nicolas' abdomen (thus corroborating Dr. Rodriguez's opinion and the description of the offense contained in petitioner's second statement to police), (2) Dr. Contin's "multiple blow" theory was inconsistent with both the condition of Nicolas' abdomen during the second autopsy and Dr. Wilson's findings based on his review of all relevant evidence, including his microscopic examination of tissue samples from several different injury sites, and (3) the violent behavior of petitioner described in petitioner's second statement to police (i.e., "stamping" on Nicolas in a sudden, unprovoked, outburst) was consistent with cases Dr. Wilson had observed or learned of through research in which a child's care giver responds to stress with a sudden, violent, unpremeditated outburst that causes the death of a child.

██ Even when viewed in the light most favorable to petitioner, at the guilt-innocence phase of trial Dr. Wilson's testimony would have faced several analytical hurdles. First, while petitioner admitted in his second statement to police that he had "stamped" on Nicolas, there was no evidence before the jury in petitioner's statements to police or from any other source suggesting petitioner was experiencing any unusual degree of stress on the evening in question. On the contrary, neither petitioner's trial testimony, petitioner's written statements to police, nor any of the testimony of prosecution witnesses regarding the events immediately preced-

ing petitioner's 911 call suggested Nicolas had done anything to provoke petitioner's fatal assault or that any other circumstances existed which otherwise caused petitioner to suffer from any unusual degree of stress. Simply put, there was no evidence before the jury at the guilt-innocence phase of petitioner's trial furnishing the factual predicate for Dr. Wilson's speculative theory that petitioner's murderous behavior might have been an unpremeditated, reflexive, response to stress.

Second, even assuming the jury chose to (1) discount Dr. Contin's multiple-blow theory based on his failure to examine the totality of the evidence reviewed by Dr. Wilson and (2) believe the opinions of Dr. Rodriguez and Dr. Wilson that all of Nicolas' fatal injuries could have resulted from a single, violent, blow to Nicolas' abdomen (which was also consistent with petitioner's second statement to police), the extensive nature of Nicolas' internal injuries would necessarily have required that the single blow to Nicolas suggested by Dr. Rodriguez and Dr. Wilson had been directed with a tremendous amount of force. In short, conclusive proof that Nicolas' injuries resulted from application of a single blow implicitly negated Dr. Rodriguez's suggestion that Nicolas' injuries might have been accidentally inflicted. Furthermore, petitioner's own trial testimony undermined any suggestion that Nicolas' fatal injuries had been accidentally inflicted by the only adult with access to Nicolas at the time those injuries were inflicted.

Under such circumstances, the state habeas court could have reasonably concluded there was no reasonable probability that, but for the non-disclosure of Dr. Wilson's opinions, the outcome of the guilt-innocence phase of petitioner's trial would have been different. *See Dickson v. Quarterman*, 462 F.3d at 477–80 (holding objectively reasonable a state court's rejection of a *Brady* claim based on the state court's objectively reasonable conclusion other evidence demonstrating the defendant's intent to kill rendered the undisclosed evidence immaterial).

The state habeas court's conclusion that petitioner failed to satisfy the materiality prong of *Brady* with regard to the guilt-innocence phase of petitioner's capital trial was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and state habeas corpus proceedings.

### 3.b.(3) *Punishment Phase of Trial*

A different result obtains, however, with regard to the punishment phase of petitioner's trial. There, the issues before the jury were whether (1) there was a probability the petitioner would commit criminal acts of violence constituting a continuing threat to society and (2) all of the evidence, including the circumstances of the offense and the petitioner's character, background, and personal moral culpability warranted a life sentence for petitioner.

By the time petitioner's trial reached the punishment phase, the jury had already implicitly rejected petitioner's testimony denying that he had kicked Nicolas. Because of this fact, at the punishment phase of petitioner's trial, Dr. Wilson's mitigating opinions would not have faced the same types of hurdles as they would have faced at the guilt-innocence phase of trial.

The prosecution attacked Dr. Rodriguez's single-blow opinion during closing arguments at the punishment phase of trial, arguing (as it had in its closing argument at the guilt-innocence phase of

trial)[98] that petitioner's multiple kicks suggested future dangerousness.[99] Thus the question whether petitioner had delivered multiple blows to Nicolas was clearly relevant and material to the issue of future dangerousness. As a circumstance of the offense, it was also relevant to the mitigation issue. Thus, insofar as Dr. Wilson's experienced professional opinion would have lent support to the single-blow theory, and undermined the prosecution's multiple-blow theory, Dr. Wilson's opinion was clearly relevant to both the special issues before the petitioner's capital sentencing jury.

Additionally, Dr. Wilson's opinion regarding the potentially unpremeditated nature of petitioner's violent actions (based on Dr. Wilson's extensive experience with injuries to children resulting from violent, albeit unpremeditated, misconduct by care givers) dove-tailed remarkably well with petitioner's description of his offense contained in petitioner's second written statement to police. In that regard, Dr. Wilson could have furnished petitioner's defense counsel with a rational explanation for petitioner's violent conduct which was vastly more beneficial to petitioner's efforts to obtain a favorable verdict on the future dangerousness and mitigation special issues than petitioner's trial counsel's dubious suggestion to the jury that petitioner had murdered Nicolas in a jealous rage.

Other than the circumstances of the offense itself (particularly the prosecution's multiple blow scenario), the prosecution offered the jury little in the way of aggravating evidence. There was virtually no evidence (other than five-year-old Dylan's disjointed, punishment-phase testimony

elicited through intensively leading questioning) suggesting petitioner's violent actions toward Nicolas had been premeditated.

Petitioner had no criminal history and no history of violent conduct prior to the date he "stamped" on Nicolas. Save for testimony about the divorce of his parents, there was no evidence petitioner suffered from any significant childhood trauma or an emotionally or economically deprived or abusive childhood. On the contrary, petitioner's step-mother, both petitioner's parents, and petitioner's twin brother all testified to petitioner's good character and good reputation for being nonviolent. Petitioner presented testimony establishing he had graduated from high school, served this nation in the armed forces, fathered a son whom he supported financially, and eventually returned to his home town where he was a trusted and reliable baby-sitter for his brother's children. Petitioner also presented family members, friends, and others who had known petitioner throughout his entire life, who testified the petitioner was a kind, loving, father and a veteran of his nation's armed forces and who, to the best of their knowledge, had never displayed any violent tendencies. They all described petitioner's murder of Nicolas as completely out of character.

Thus, Dr. Wilson's testimony would have substantiated Dr. Rodriguez's single blow opinion, undermined Dr. Contin's multiple blow opinion, and offered the jury a rational basis for concluding petitioner was unlikely to pose a threat of continuing violence.

Under these circumstances, the state habeas court's conclusion that petitioner

**98.** S.F. Trial, Volume 23, at pp. 52–55. The thrust of the prosecution's closing argument at the guilt-innocence phase of trial was focused on attacking the credibility of the defense's footprint expert's conclusions

regarding the bruising on Nicolas' external abdomen.

**99.** S.F. Trial, Volume 25, at pp. 31–32.

failed to satisfy *Brady's* materiality prong in connection with the punishment phase of petitioner's capital trial was an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, and based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and state habeas corpus proceedings.

### 4. *Conclusions*

The state habeas court unreasonably concluded petitioner failed to satisfy the first two prongs of clearly established Brady analysis. The clear and convincing evidence before this Court establishes the prosecution failed to disclose Dr. Wilson's favorable professional opinions and personal knowledge. First, Dr. Wilson's trial testimony would have undermined the credibility of prosecution expert Dr. Contin. Second, Dr. Wilson's would have substantiated (with considerably more expertise than Dr. Rodriguez could offer) Dr. Rodriguez's single-blow opinion. Third, Dr. Wilson could have furnished a professional opinion consistent with petitioner's second statement to police which explaining petitioner's violent, unprovoked, outburst toward Nicolas as an unpremeditated act.

The state habeas court's conclusion that petitioner failed to satisfy the materiality prong of *Brady* in connection with the punishment phase of petitioner's capital trial was not merely incorrect, it was an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, and based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and state habeas corpus proceedings. Peti-

tioner is entitled to a new capital sentencing hearing.

### VI. *Ineffective Assistance by Trial Counsel*

### A. *The Claim*

In his second claim herein, petitioner argues his trial counsel rendered ineffective assistance by failing to discover and present Dr. Wilson's exculpatory, impeaching, and mitigating opinions.[100]

### B. *State Court Disposition*

In the course of its Order issued June 28, 2004 recommending denial of petitioner's state habeas corpus application, the state habeas trial court concluded in pertinent part as follows:

30. Neither prong of *Strickland* is satisfied because the defense made use of the single-blow opinion through the testimony of Dr. Rodriguez.

31. Specifically, it could not be deficient performance to fail to put on the testimony of Dr. Wilson when the same opinion and testimony was given by the defense pathologist, Dr. Rodriguez, who was the only doctor who was unwavering in his single-blow theory.

32. The second prong of *Strickland* cannot be met for the same reason, namely, since the testimony that Avila complains about being omitted was testified to by another pathologist, it cannot be said that had Dr. Wilson had [sic] testified to the same thing that there is a reasonable probability that the results of the trial would have been different.

33. Viewing all of the evidence presented, the single-blow opinion, if presented from the equivocating source, namely, Dr. Wilson, would not have made a difference in the trial. For this

---

**100.** Petition, at pp. 110–27; Reply, at pp. 2–31.

additional reason, the second *Strickland* prong has not been met.[101]

The Texas Court of Criminal Appeals expressly adopted the foregoing conclusions of law when it denied petitioner's state habeas corpus application.

### C. *AEDPA Review*

#### 1. *The Federal Constitutional Standard of Review*

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland,* i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so

doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith,* 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* In evaluating prejudice, a federal habeas court must re-weigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Crim-

---

**101.** State Habeas Transcript, at pp, 222–23.

inal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir.2003), *cert. denied,* 540 U.S. 1154, 124 S.Ct. 1156, 157 L.Ed.2d 1050 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo. See Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding de *novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

## 2. *Synthesis*

### a. *The Issues Before this Court*

Petitioner faults his trial counsel for failing to adequately investigate, discover, develop, and present the exculpatory, impeaching, and mitigating testimony of Dr. Harry L. Wilson. As discussed at length above, the state habeas trial court unreasonably and incorrectly concluded the assistance Dr. Wilson could have rendered petitioner's trial counsel was limited to corroborating Dr. Rodriguez's single-blow theory. Had the prosecution complied with its constitutional duty under *Brady,* Dr. Wilson could have furnished petitioner's trial counsel with a wealth of additional benefits beyond merely corroborating Dr. Rodriguez's single-blow opinion. Petitioner correctly points out that Dr. Wilson could also have furnished testimony impeaching the validity of prosecution expert Dr. Contin's multiple-blow theory

and suggesting petitioner's infliction of fatal injuries to Nicolas fit within a recognized syndrome of unpremeditated injuries to children inflicted by care givers. Moreover, Dr. Wilson's considerably greater experience would have rendered him invulnerable to the same sort of attacks on Dr. Rodriguez's credibility employed by the prosecution at petitioner's trial, i.e., challenges based on Dr. Rodriguez's perceived lack of extensive experience as a practitioner. The state habeas court's view of the relevance of Dr. Wilson's opinions and personal knowledge to the issues in petitioner's capital trial was unreasonably circumscribed, both factually and legally.

However myopic the state habeas court's view of Dr. Wilson's potential trial testimony might have been, under the AEDPA the issue before this Court remains whether the state habeas court *unreasonably* concluded petitioner's complaints about the performance of his trial counsel failed to satisfy either prong of *Strickland.* As was the case with this Court's analysis of petitioner's *Brady* claim, separate analysis of petitioner's ineffective assistance complaint against his trial counsel is necessary for each phase of petitioner's capital trial. *See Schaetzle v. Cockrell,* 343 F.3d at 444 (applying the AEDPA's standard of review, the issue before this Court is whether the Texas Court of Criminal Appeals could *reasonably* have concluded that petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.*

### b. *Guilt–Innocence Phase of Trial*

### (1) *Arguably No Prejudice*

The standard for determining whether the "prejudice" prong of *Strickland* has

been satisfied is identical to the legal standard for determining "materiality" under *Brady*. *See Banks v. Dretke*, 540 U.S. at 698–99, 124 S.Ct. at 1276 (holding evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different); *Kyles v. Whitley*, 514 U.S. at 433–34, 115 S.Ct. at 1565–66 (holding the *Brady* materiality standard is identical to the prejudice prong of *Strickland*).

While it is an extremely close question, for the reasons set forth at great length above in Section V.C.3.b.(2), the state habeas court could reasonably have concluded the absence of Dr. Wilson's testimony from the guilt-innocence phase of petitioner's capital trial did not "prejudice" petitioner within the meaning of *Strickland*.

### (2) *No Deficient Performance*

■ Moreover, petitioner has alleged no specific facts showing the failure of petitioner's trial counsel to interview Dr. Wilson prior to the guilt-innocence phase of trial was objectively unreasonable. While the prosecution had repeatedly listed Dr. Wilson in pretrial filings with the trial court as both a potential fact witness and expert witness, there was nothing in those filings which put petitioner's trial counsel on notice that Dr. Wilson possessed any personal knowledge or professional opinions relevant to petitioner's case beyond those expressed in Dr. Wilson's surgical report, i.e., factual findings and opinions describing the extensive injuries to Nicolas' internal organs and abdominal tissues. Petitioner has identified no specific facts showing his trial counsel had any rational basis to suspect Dr. Wilson possessed personal knowledge or professional opinions which could have impeached Dr. Contin's multiple-blow theory or offered a rational explanation for petitioner's violent behavior toward Nicolas.

As was explained in detail in Section V.C.2.C. above, there is no evidentiary foundation for the state habeas trial court's factual findings suggesting petitioner's trial counsel had access to Dr. Wilson's exculpatory, mitigating, and impeaching opinions prior to trial. Dr. Wilson's conversations with Dr. Rodriguez at Nicolas' second autopsy did not address any firm opinions regarding the cause of Nicolas' death because Dr. Wilson did not reach any firm opinions regarding same until months later. Dr. Wilson's surgical report did not address the cause of Nicolas' death.

The clear and convincing evidence now before this Court establishes that petitioner's trial counsel were not made aware prior to or during trial of any information indicating either that (1) Dr. Wilson possessed a professional opinion that the probable cause of Nicolas' death was a single, violent, blow to Nicolas' abdomen, (2) Dr. Wilson could have impeached Dr. Contin's multiple-blow theory by pointing out Dr. Contin had failed to review the slides of tissue samples and surgical report prepared by Dr. Wilson, or (3) Dr. Wilson possessed a professional opinion that the circumstances of Nicolas' death fit those of other cases of unpremeditated fatal violence by care givers toward children. Petitioner's trial counsel cannot reasonably be faulted for failing to interview Dr. Wilson when they had access to absolutely no information which put them on notice that Dr. Wilson was a potential source of any exculpatory, mitigating, or impeachment evidence.

Prior to the conclusion of the guilt-innocence phase of petitioner's trial, petitioner's trial counsel had no reason to believe interviewing Dr. Wilson would furnish them with any helpful information or evi-

dence. Thus, the state habeas court could reasonably have concluded the failure of petitioner's trial counsel to interview Dr. Wilson prior to the conclusion of the guilt-innocence phase of trial was objectively reasonable professional conduct. Petitioner's trial counsel were not required to employ clairvoyance in their search for exculpatory, mitigating, or impeaching evidence. *See Sharp v. Johnson,* 107 F.3d 282, 290 n. 28 (5th Cir.1997)("Clairvoyance is not a required attribute of effective representation.").

### c. *Punishment Phase of Trial*

#### (1) *Prejudice Established*

For the reasons set forth at length above in Section V.C.3.b.(3), the state habeas court erroneously and unreasonably concluded the absence of Dr. Wilson's testimony from the punishment phase of petitioner's capital trial did not prejudice petitioner within the meaning of *Strickland.* There is a reasonable probability that, but for the absence of Dr. Wilson's testimony, the outcome of the punishment phase of petitioner's capital trial would have been different. There is no room for debate among reasonable jurists about this court's conclusion on this matter.

Petitioner had absolutely no criminal record prior to his assault on Nicolas Macias. Petitioner presented his capital sentencing jury with a plethora of witnesses testifying to petitioner's good character, service in this nation's armed forces, and sterling reputation for non-violence. In its case, the prosecution pointed only to the circumstances of petitioner's offense and argued Dr. Contin's multiple-blow theory established petitioner's future dangerousness and lack of entitlement to a life sentence. These arguments would not have been nearly as persuasive if Dr. Wilson's testimony had been presented to petitioner's capital sentencing jury.

Dr. Wilson, a much more experienced pathologist than Dr. Rodriguez, was prepared to show the jury diagrams demonstrating the medical fallacies underlying Dr. Contin's multiple-blow theory and also to testify Dr. Contin had not examined all of the forensic evidence which Dr. Wilson had available to him. Dr. Wilson was also prepared to opine that the circumstances of Nicolas Macias' death led him to conclude the petitioner had lashed out in an unpremeditated, albeit recklessly violent, manner and that the petitioner had struck Nicolas without necessarily intending to cause Nicolas' death.

Under such circumstances, the state habeas court's conclusion that petitioner failed to satisfy the prejudice prong of *Strickland* in connection with the punishment phase of petitioner's capital trial was an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, and based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and state habeas corpus proceedings.

#### (2) *Arguably No Deficient Performance*

While it is admittedly an extremely close question, the state habeas court could have reasonably, albeit perhaps erroneously, concluded the failure of petitioner's trial counsel to interview Dr. Wilson in connection with the punishment phase of petitioner's trial was objectively reasonable.

Regardless of whether Cichon and Locke did so intentionally or negligently, they effectively concealed from petitioner's trial counsel all of Dr. Wilson's mitigating opinions. In fact, the prosecution went to great lengths to ensure the defense would not contact Dr. Wilson prior to trial, repeatedly listing Dr. Wilson as both a potential fact and expert witness, furnishing

petitioner's trial counsel with a copy of Dr. Wilson's surgical report (which contained no mitigating or exculpatory information), advising the trial court on the record it could not appoint Dr. Wilson to assist petitioner's trial counsel because such an action would create a conflict of interest, and designating Dr. Wilson as the prosecution's representative at Nicolas' second autopsy.

Cichon and Locke engaged in egregious professional misconduct. Given the scenario created by such conduct, petitioner's defense counsel could reasonably have concluded prior to trial there was likely no benefit to be gained from seeking an interview with Dr. Wilson. Dr. Wilson was under no legal obligation to speak with petitioner's defense counsel and could readily have refused all their requests for an interview. *See Johnson v. Puckett,* 176 F.3d 809, 816 (5th Cir.1999)(holding a prosecution witness's refusal to talk with defense counsel did not rise to the level of "cause" sufficient to overcome a procedural default where there was no showing the witness's refusal was the result of official intimidation, threats, or duress); *United States v. Soape,* 169 F.3d 257, 271 n. 9 (5th Cir.1999)(recognizing that a government witness who does not wish to speak to or be interviewed by the defense prior to trial may not be required to do so), *cert. denied,* 527 U.S. 1011, 119 S.Ct. 2353, 144 L.Ed.2d 249 (1999); *United States v. Caldwell,* 750 F.2d 341. 347 (5th Cir.1984) (noting that a defendant's right of access to a witness exists coextensively with that witness's right to refuse to say anything), *cert. denied,* 471 U.S. 1007, 105 S.Ct. 1873, 85 L.Ed.2d 166 (1985); *United States v. Benson,* 495 F.2d 475, 479 (5th Cir.1974) (holding the uniform rule is that a government witness who does not wish to be interviewed by the defense may not be required to do so), *cert. denied,* 419 U.S. 1035, 95 S.Ct. 519, 42 L.Ed.2d 310 (1974). Thus,

the state habeas court could have reasonably concluded there was nothing objectively unreasonable with the failure of petitioner's trial counsel to contact Dr. Wilson prior to trial.

However, reasonable minds could easily disagree over whether, once the prosecution rested its case at the punishment phase of petitioner's trial *without calling Dr. Wilson to testify,* competent trial counsel would have been alerted to the possibility Dr. Wilson might be a source of assistance to the defense in connection with the punishment phase of petitioner's trial. In fact, it could be argued the prosecution's failure to call Dr. Wilson to testify at either the guilt-innocence or punishment phases of petitioner's capital trial (after the prosecution had done practically everything it could to discourage petitioner's defense counsel from contacting Dr. Wilson prior to that time) should have set off alarm bells in the minds of petitioner's trial counsel.

By the same token, however, reasonably prudent defense counsel representing petitioner were entitled to rely upon the prosecution complying with its constitutional duty under *Brady* to disclose favorable information to defense counsel, including any mitigating evidence which might be in the possession of prosecution experts. "The duty of a prosecutor, as the representative of the sovereign in a criminal case, is 'not that it shall win a case, but that justice shall be done.'" *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *Dickson v. Quarterman,* 462 F.3d at 479. The only concrete information available to petitioner's trial counsel at the time of trial regarding Dr. Wilson's personal knowledge or professional opinions about Nicolas' death consisted of (1) a surgical report which documented the extensive nature of Nicolas' internal injuries and (2) Dr. Wil-

son's ambiguous comments to Dr. Rodriguez made at the time of Nicolas' second autopsy suggesting Nicolas' internal injuries were so extensive it would be difficult to ascertain whether Nicolas had been struck once or multiple times. Finally, Dr. Wilson was far from the only expert listed among the prosecution's potential witnesses who was not called to testify at petitioner's trial.

Under these circumstances, the state habeas court could reasonably have concluded, albeit perhaps erroneously, the petitioner's trial counsel acted in an objectively reasonably manner when they failed to contact Dr. Wilson once the prosecution rested at the punishment phase of petitioner's trial.

### 3. *Conclusions*

The state habeas court could reasonably have rejected petitioner's complaint of ineffective assistance by his trial counsel at the guilt-innocence phase of trial by concluding there was nothing professionally deficient with the decision of petitioner's trial counsel not to contact Dr. Wilson prior to trial or during the guilt-innocence phase of trial.

Likewise, while petitioner was demonstrably "prejudiced" within the meaning of *Strickland* by the absence of Dr. Wilson's testimony from the punishment phase of trial, the state habeas court could reasonably have rejected petitioner's complaint of ineffective assistance by his trial counsel at the punishment phase of trial based on a conclusion there was nothing professionally deficient in the failure of petitioner's trial counsel to contact petitioner once the prosecution rested at the punishment phase of trial without calling Dr. Wilson.

Therefore, the state habeas court's rejection on the merits of petitioner's complaints of ineffective assistance by his trial counsel was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and state habeas corpus proceedings.

## VII. *Ineffective Assistance by Appellate Counsel*

### A. *The Claim*

In his fourth claim for federal habeas relief herein, petitioner argues his appellate counsel rendered ineffective assistance by failing to assert a point of error on direct urging the same *Apprendi/Ring* legal argument petitioner asserted in his third claim herein, discussed and rejected on the merits by this Court in Section IV.C. above.[102]

### B. *State.Court Disposition*

In its Order issued June 28, 2004 recommending denial of petitioner's state habeas corpus application, the state habeas trial court made the following conclusion:

47. *Ring v. Arizona* did not affect settled law previously announced by the Court of Criminal Appeals that, on the mitigation issue, neither party bears the burden of proof, and no constitutional violation occurs because of the absence of a burden of proof on the issue. Consequently, the trial court did not err in failing to assign a burden of proof to the mitigation issue, and appellate counsel was not ineffective for failing to raise the issue on direct appeal.[103]

---

**102.** Petition, at pp. 141–44; Reply, at pp. 31–34.

**103.** State Habeas Transcript, at p. 226.

The Texas Court of Criminal Appeals expressly adopted this conclusion of law when it denied petitioner's state habeas corpus application.

## C. AEDPA Review

### 1. The Federal Constitutional Standard of Review

The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000)(holding a petitioner arguing ineffective assistance by his appellate counsel must establish both (1) his appellate counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal); *Henderson v. Quarterman*, 460 F.3d 654, 665 (5th Cir.2006)(holding *Strickland* furnishes the proper standard for review of a complaint of ineffective assistance by state appellate counsel), *cert. denied*, —— U.S. ——, 127 S.Ct. 1383, 167 L.Ed.2d 160 (2007); *Amador v. Quarterman*, 458 F.3d at 410–11 (holding complaints of ineffective assistance by state appellate counsel are governed by the *Strickland* standard of review); *Moreno v. Dretke*, 450 F.3d 158, 168 (5th Cir.2006)(applying the dual prongs of *Strickland* analysis to complaints of ineffective assistance by appellate counsel), *cert. denied*, —— U.S. ——, 127 S.Ct. 935, 166 L.Ed.2d 717 (2007); *Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir.2004)(holding *Strickland* applies to a prisoner's claim his appellate counsel was ineffective for failing to raise a certain issue on appeal), *cert. denied*, 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004); *Gutierrez v. Dretke*, 392 F.Supp.2d at 861–62 (applying *Strickland* analysis to complaints of ineffective assistance by state appellate counsel).

Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into (1) whether appellate counsel's performance was deficient, i.e., whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) whether appellate counsel's allegedly deficient performance "prejudiced" petitioner, i.e., whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of petitioner's appeal would have been different. *Smith v. Robbins*, 528 U.S. at 285, 120 S.Ct. at 764; *Henderson v. Quarterman*, 460 F.3d at 665; *Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d at 444; *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999).

Appellate counsel who files a merits brief need not and should not raise every non-frivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins*, 528 U.S. at 288, 120 S.Ct. at 765/ *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983); *Henderson v. Quarterman*, 460 F.3d at 665; *Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d at 445.

The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986); *Jones v. Barnes*, 463 U.S. at 751–52, 103 S.Ct. at 3313.

Nonetheless, appellate counsel is obligated to research relevant facts and law or to make an *informed* decision that certain avenues will not prove fruitful. *See Busby v. Dretke*, 359 F.3d at 714 (a reasonable attorney has an obligation to research rele-

vant facts and law or make an informed decision that certain avenues will not be fruitful); *United States v. Reinhart,* 357 F.3d 521, 525 (5th Cir.2004)(holding the same); *Schaetzle v. Cockrell,* 343 F.3d at 445 (failure to raise a discrete, purely legal issue, where the precedent could not be more pellucid or applicable, denies adequate representation). Likewise, solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the appellate court's attention. *United States v. Reinhart,* 357 F.3d at 525; *Schaetzle v. Cockrell,* 343 F.3d at 445; *United States v. Williamson,* 183 F.3d at 463.

Where, as in petitioner's case, appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more non-frivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores–Ortega,* 528 U.S. 470, 477 & 482, 120 S.Ct. 1029, 1034 & 1037, 145 L.Ed.2d 985 (2000)(holding the dual prongs of *Strickland* apply to complaints of ineffective appellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith v. Robbins,* 528 U.S. at 287–89, 120 S.Ct. at 765–66 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland* ); *Busby v. Dretke,* 359 F.3d at 714–17 (applying dual prongs of *Strickland* to a complaint about appellate counsel's failure to present a point of error on appeal).

### 2. *Synthesis*

#### a. *No Prejudice*

For the reasons set forth at length in Section IV.C. above, there is no reasonable probability that, but for the failure of petitioner's state appellate counsel to present the same legal arguments premised on *Apprendi v. New Jersey, supra,* and *Ring v. Arizona, supra,* raised by petitioner in his third claim for federal habeas relief herein, the outcome of petitioner's state direct appeal would have been different. Thus, the state habeas court reasonably concluded petitioner's ineffective assistance directed against his state appellate counsel was without merit.

#### b. *No Deficient Performance*

Likewise, petitioner's state appellate counsel acted in an eminently reasonable manner in failing to assert the petitioner's *Apprendi/Ring* arguments herein to the Texas Court of Criminal Appeals on direct appeal. Appellate counsel need not assert every potentially viable point of error available; rather, the process of winnowing out points of error which present only a slim potential for success in favor of focusing the appellate court's attention on an appellant's most appealing legal arguments is the antithesis of ineffective appellate assistance. *Smith v. Murray,* 477 U.S. at 536, 106 S.Ct. at 2667; *Jones v. Barnes,* 463 U.S. at 751–52, 103 S.Ct. at 3313. Petitioner's *Apprendi/Ring* arguments herein are inconsistent with the Supreme Court's analytical approach in *Tuilaepa* and ignore the vastly divergent approaches to capital sentencing employed by Arizona in *Ring* and by Texas in petitioner's case. Petitioner's appellate counsel could reasonably have concluded petitioner's *Apprendi/Ring* arguments possessed little likelihood of success on direct appeal. Thus, there was nothing objectively unreasonable with the decision of petitioner's state appellate counsel to forego assertion of petitioner's *Apprendi/Ring* arguments in the course of petitioner's direct appeal.

Even more significantly, petitioner has presented neither the state habeas court nor this Court with any fact-specific allegations suggesting precisely *why* petitioner's state appellate counsel failed to assert petitioner's *Apprendi/Ring* arguments on direct appeal. Petitioner also presented neither the state habeas court nor this Court with any affidavits or other evidence establishing why petitioner's state appellate counsel chose not to assert petitioner's *Apprendi/Ring* arguments on direct appeal. Under such circumstances, petitioner has failed to allege any facts sufficient to overcome the presumption of reasonableness applicable to the performance of petitioner's state appellate counsel. *See Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66 (holding a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance); *Busby v. Dretke,* 359 F.3d at 714 (quoting *Strickland* for the proposition the defendant must overcome the presumption that, under the circumstances, appellate counsel's challenged action might be considered "sound trial strategy"); *Schaetzle v. Cockrell,* 343 F.3d at 445 (there is a strong presumption that appellate counsel's actions were reasonable). The state habeas court reasonably concluded petitioner's complaint about the performance of his appellate counsel failed to satisfy both prongs of *Strickland.*

### 3. *Conclusion*

The state habeas court's rejection on the merits of petitioner's complaint of ineffective assistance by his state appellate counsel was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and state habeas corpus proceedings.

### VIII. *Request for Evidentiary Hearing*

■■ In his latest pleading, petitioner renews his request for an evidentiary hearing.[104] However, the AEDPA limits the circumstances in which a habeas corpus petitioner may obtain an evidentiary hearing in federal court, imposing a significant burden on petitioners who fail to diligently develop the factual bases for their claims in state court. *See Williams v. Taylor,* 529 U.S. 420, 433–34, 120 S.Ct. 1479, 1489, 146 L.Ed.2d 435 (2000)(prisoners who are at fault for the deficiency in the state court record must satisfy a heightened standard to obtain an evidentiary hearing); 28 U.S.C. § 2254(e)(2). "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor,* 529 U.S. at 437, 120 S.Ct. at 1491. Under the AEDPA, if a petitioner failed to develop the factual basis of a claim in state court, he is entitled to a federal evidentiary hearing only if: (1) the claim relies on either (a) a new rule of constitutional law, made retroactive on collateral review by the Supreme Court, that was previously unavailable or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence *and* (2) the facts underlying the claim are sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable fact-finder would have found the petitioner guilty of the underlying offense. *Foster v. Johnson,* 293 F.3d 766, 775 n. 9 (5th Cir. 2002), *cert. denied,* 537 U.S. 1054, 123 S.Ct. 625, 154 L.Ed.2d 532 (2002); *Dowthitt v.*

**104.** Reply, at p. 34.

*Johnson,* 230 F.3d 733, 757 (5th Cir.2000), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); 28 U.S.C. § 2254(e)(2).

 "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petitioner's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan,* —— U.S. at ——, 127 S.Ct. at 1940 (citation omitted). "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id.*

Petitioner exercised abundant due diligence in attempting to secure an evidentiary hearing during his state habeas corpus proceeding. Frankly, the complexity of both the factual and legal posture of petitioner's federal habeas claims herein could have been greatly reduced had the state habeas court granted petitioner's request. By holding an evidentiary hearing to ascertain the precise circumstances surrounding the withholding of Dr. Wilson's favorable opinions from the defense, and then making concise findings resolving those factual disputes, the state habeas court could have avoided its numerous clearly erroneous factual findings. However, given the floridly erroneous legal principles the state habeas court applied in the course of its rejection of petitioner's *Brady* claim, there is no guarantee an evidentiary hearing would have resulted in the issuance of factual findings relevant and germane to petitioner's *Brady* claim.

 Fortunately, when viewed in the context of clearly established federal law, as set forth in the opinions of the United States Supreme Court discussed in Section IV.C. above, the purported factual dispute

regarding the prosecutors' personal knowledge of Dr. Wilson's opinions favorable to the defense is rendered moot. Petitioner's prosecuting attorneys owed petitioner a constitutional duty to know when disclosure of favorable evidence was required by them and to comply with that duty, regardless of whether they were ever personally informed of the existence of Dr. Wilson's opinions and personal knowledge favorable to the defense. *See Dickson v. Quarterman,* 462 F.3d at 479 (holding a prosecutor was obligated to disclose information favorable to the defense contained in pretrial interview statements despite said prosecutor's belief the information was protected from disclosure by the work-product doctrine). "[A] prosecutor faithfully discharges his duty where he fully understands his obligations under *Brady,* not where, as here, he fails to 'consciously think about it one way or the other.'" *Id.*

Likewise, based on the affidavits of petitioner's prosecuting attorneys, there is no genuine issue of material fact regarding Dr. Wilson's status as a person "acting on the government's behalf" for *Brady* purposes. By admitting they actually consulted with Dr. Wilson prior to trial and relied upon Dr. Wilson's opinions in formulating their trial strategy, the two Assistant El Paso County District Attorneys who prosecuted petitioner established beyond any doubt that Dr. Wilson was "acting on the government's behalf" in connection with petitioner's trial.

The State owed a constitutional duty to advise petitioner of Dr. Wilson's opinions favorable to the defense, even if, through negligent oversight or malicious indifference, neither of petitioner's prosecutors personally ever inquired of Dr. Wilson whether he possessed any opinions or personal knowledge favorable to the defense. Thus, it is unnecessary for this Court to

hold an evidentiary hearing to resolve Dr. Wilson's status or the applicability of *Brady* to his opinions favorable to the defense. It is simply impossible to believe Dr. Wilson's opinions and charts supporting the one-blow theory are immaterial under *Brady*.

Petitioner has furnished this Court with detailed affidavits from Dr. Wilson setting forth with clarity precisely what testimony beneficial to the defense Dr. Wilson could have furnished had he been called to testify at petitioner's trial. As is explained at great length in Section IV.C.2.C. above, there is no evidence currently before this Court contradicting petitioner's assertions and affidavits establishing that his trial counsel had no notice Dr. Wilson possessed these opinions or personal knowledge favorable to the defense. There is likewise no fact-specific allegation, much less any evidence, currently before this Court suggesting petitioner's trial counsel made a fully informed decision not to call Dr. Wilson to testify at petitioner's trial. As explained in Section VI.C.2. above, even if a more sophisticated defense counsel might have been suspicious when the prosecution rested at the punishment phase of trial without calling Dr. Wilson to testify, the state trial court reasonably concluded there was nothing objectively unreasonable in the failure of petitioner's trial counsel to interview Dr. Wilson prior to or during petitioner's trial. Thus, this Court is not called upon to resolve disputed fact questions such as whether petitioner's trial counsel made a reasonable strategic decision not to call Dr. Wilson to testify at petitioner's trial or whether petitioner was prejudiced by his trial counsel's failure to interview Dr. Wilson prior to the conclusion of petitioner's trial.

For the foregoing reasons, petitioner is not entitled to an evidentiary hearing in this Court.

## IX. *Certificate of Appealability*

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998).

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000)(holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997)(holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is grant-

ed or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

■ A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. at 2569; *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle,* 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is authorized to address the propriety of granting a CoA *sua sponte. Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000).

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell,* 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

■ In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Foster v. Quarterman,* 466 F.3d 359, 364 (5th Cir.2006), *cert. denied,* — U.S. —, 127 S.Ct. 2099, 167 L.Ed.2d 817 (2007); *Dickson v. Quarterman,* 462 F.3d 470, 476 (5th Cir.2006); *Pippin v. Dretke,* 434 F.3d 782, 787 (5th Cir.2005), *cert. denied,* — U.S. —, 127 S.Ct. 351, 166 L.Ed.2d 49 (2006); *Bridgers v. Dretke,* 431 F.3d 853, 861 (5th Cir.2005), *cert. denied,* — U.S. —, 126 S.Ct. 2961, 165 L.Ed.2d 959 (2006).

This Court will review petitioner's claims herein for certificate of appealability purposes in reverse order.

Petitioner's fifth claim herein is contrary to well-settled Supreme Court and Fifth Circuit precedent and undeserving of any encouragement to proceed further along the judicial process.

Petitioner's fourth claim herein is equally devoid of any arguable merit because petitioner wholly failed to present the state habeas court with any fact-specific allegations, much less any evidence, showing his state appellate counsel's decision not to present an *Apprendi/Ring* claim on direct appeal was objectively reasonable. No state or federal court has yet accepted the novel legal arguments petitioner proposes in support of his *Apprendi/Ring* claim herein. Regardless of what one might think of the merits of petitioner's proposed new rule, there was certainly nothing unreasonable with petitioner's state appellate counsel's decision not to seek to break new legal ground during petitioner's direct appeal when the trial court record included a plethora of far more mundane points of error (such as the state trial court's admission of the leading-question-induced testimony of Dylan Salinas).

In his third claim herein, i.e., his *Apprendi/Ring* claim, petitioner seeks the adoption of a new rule premised upon shoving the square peg of the Texas capital sentencing scheme into the round hole created by the Supreme Court's holdings in that pair of New Jersey and Arizona cases. For the reasons set forth at length in Section IV above, petitioner's third claim herein does not warrant federal habeas relief because a Texas capital sentencing jury's answer to the *Penry* special issue serves a very different constitutional purpose than the trial judge's fact findings did in *Ring*. Admittedly, there is ample room for disagreement among reasonable

jurists with both the Texas Court of Criminal Appeals' and this Court's conclusions rejecting the merits of petitioner's *Apprendi/Ring* claim. The Supreme Court has broadly construed its holding in *Apprendi* to invalidate non-capital sentencing schemes which gave judges the ability to impose sentences above those authorized by the jury's verdict alone. *See, e.g., Cunningham v. California,* —— U.S. ——, ——, 127 S.Ct. 856, 860, 166 L.Ed.2d 856 (2007)(holding the relevant inquiry for Sixth Amendment purposes is whether the non-capital sentence actually imposed exceeded that which was authorized without any additional non-jury factual findings); *Blakely v. Washington,* 542 U.S. 296, 303–04, 124 S.Ct. 2531, 2537, 159 L.Ed.2d 403 (2004)(holding the same); *United States v. Booker,* 543 U.S. 220, 244, 125 S.Ct. 738, 756, 160 L.Ed.2d 621 (2005)(any factor other that a prior conviction which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt).

This Court has concluded the Texas Court of Criminal Appeals reasonably declined to extend the *Apprendi/Ring* rule to the Texas capital sentencing scheme's *Penry* special issue because that special issue serves a role distinctly different for Eighth Amendment purposes from the factual findings involved in *Apprendi, Ring, Cunningham, Blakely,* and *Booker*. Unfortunately, there is currently no "squarely in point" federal appellate precedent available to guide this Court's Eighth Amendment analysis of petitioner's *Apprendi/Ring* claim. The Supreme Court has yet to address the applicability of its *Apprendi/Ring* line of cases to the Texas capital sentencing scheme's Penry special issue. The Fifth Circuit's opinions to date

focus on the Sixth Amendment's guarantees and do not expressly address this Court's Eighth Amendment analysis. *See Scheanette v. Quarterman,* 482 F.3d 815, 828 (5th Cir.2007)(distinguishing the Texas capital sentencing scheme's mitigation special issue from those issues involved in *Ring* and *Apprendi* on the ground a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death); *Sonnier v. Quarterman,* 476 F.3d at 363–67 (relying on the similarity between the Texas capital sentencing scheme and the Kansas capital sentencing approved in *Kansas v. Marsh* to reject an *Apprendi/Ring* challenge to the absence of a burden of proof requirement for Texas' *Penry* special issue); *Granados v. Quarterman,* 455 F.3d at 537 (perfunctorily rejecting an *Apprendi/Ring* challenge to the Texas capital sentencing scheme on the ground a jury's affirmative answer to the Texas capital sentencing scheme's *Penry* special issue reduces a sentence from death rather than increasing it to death); *Rowell v. Dretke,* 398 F.3d 370, 379 (5th Cir.2005) ("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."). In none of these opinions did the Fifth Circuit explain why the differences between the Texas capital sentencing scheme and the constitutionally defective schemes at issue in *Apprendi* and *Ring* warranted rejection of the Sixth *and* Eighth Amendment arguments raised therein. Thus, were it not for one procedural hurdle, the Eighth Amendment aspects of petitioner's *Apprendi/Ring* claim might be arguably framed for resolution in this cause. *Contra Scheanette v. Quarterman,* 482 F.3d at 828 (holding a *Ring/Apprendi* claim similar to petitioner's herein did not warrant a CoA).

However, respondent correctly points out the non-retroactivity principle announced in *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989), precludes this Court and any other federal court from extending the Supreme Court's holdings in *Apprendi* and *Ring* to the Texas capital sentencing scheme in the context of a federal habeas corpus proceeding. Any extension of the Supreme Court's holdings in its *Apprendi/Ring* line of cases to invalidate the Texas capital sentencing scheme's *Penry* special issue must come in the context of a direct appeal, not in a federal habeas corpus proceeding governed by *Teague v. Lane.* Petitioner's *Apprendi/Ring* claim is not deserving of approval to proceed further.

■ Reasonable jurists could not disagree with the Texas Court of Criminal Appeals' implicit conclusion there was nothing objectively unreasonable about the failure of petitioner's trial counsel to interview Dr. Wilson prior or during the guilt-innocence phase of petitioner's trial. *See Smith v. Collins,* 977 F.2d 951, 960 (5th Cir.1992) ("The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources."), *cert. denied,* 510 U.S. 829, 114 S.Ct. 97, 126 L.Ed.2d 64 (1993). For the reasons discussed in Section VI.C.2.C above, however, petitioner was clearly prejudiced *at the punishment phase* of his capital trial by the absence of Dr. Wilson's testimony. Moreover, reasonable jurists could disagree with the Texas Court of Criminal Appeals' and this Court's conclusions regarding the objective reasonableness of petitioner's trial counsel's failure to interview Dr. Wilson after the prosecution rested at the punishment phase of trial without calling Dr. Wilson as a witness. Accordingly, petitioner is entitled to a certificate of appealability with

regard to this portion of his second claim herein.

 Finally, petitioner is also entitled to a certificate of appealability with regard to whether his constitutional rights under *Brady* were violated at the guilt-innocence phase of his capital trial by the prosecution's failure to disclose the favorable opinions and personal knowledge of Dr. Wilson. As was explained at length in Section V.C.3. above,[105] Dr. Wilson's opinions and personal knowledge, which were clearly withheld by the prosecution from the defense, would have been of great value at the guilt-innocence phase of petitioner's trial in impeaching the multiple-blow theory of prosecution expert Dr. Contin. Furthermore, the question whether the prosecution's withholding of Dr. Wilson's personal knowledge and opinions satisfied the materiality prong of *Brady* at the guilt-innocence phase of petitioner's trial is an extremely close question.

While this Court has concluded the Texas Court of Criminal Appeals reasonably believed Dr. Wilson's testimony did not satisfy the materiality prong of *Brady* in connection with the guilt-innocence phase of petitioner's trial, reasonable jurists could easily disagree with this Court's conclusion on that subject. For instance, other courts could reasonably conclude revelation of Dr. Wilson's opinions and personal knowledge would have likely led to adoption of a wholly different guilt-in-nocence trial strategy by petitioner's trial counsel. This Court remains convinced petitioner's own testimony at the guilt-innocence phase of his capital trial greatly diminished any benefit the defense might have obtained through the admission of Dr. Wilson's testimony at the guilt-innocence phase of petitioner's trial.[106] However, reasonable jurists could disagree with this Court's conclusion in that regard. For example, the knowledge of Dr. Wilson's opinions might have discouraged petitioner from testifying or encouraged petitioner's counsel to develop and pursue a different line of defense at trial.

## X. *Orders*

Accordingly, it is hereby **ORDERED** that:

1. Petitioner's renewed request for an evidentiary hearing is **DENIED.**

2. All relief requested in petitioner's second through fifth claims for relief herein is **DENIED.**

3. Petitioner's first claim for relief herein, i.e., petitioner's *Brady* claim, is **CONDITIONALLY GRANTED IN PART** as follows: this Court will issue a Writ of Habeas Corpus unless, within ninety days from this date, the State of Texas either (1) grants petitioner a new trial on the issue of punishment only, as permitted by Article 44.29(c), Texas Code of Criminal Procedure, or (2) vacates petitioner's death sentence and imposes sentence of less than

---

105. *See* pp. 80–93, *supra.*

106. Petitioner has alleged no specific facts and has presented this Court with no evidence showing that, but for the failure of the prosecution to disclose Dr. Wilson's favorable opinions and personal knowledge, petitioner would have refrained from taking the stand at the guilt-innocence phase of his capital trial and undermining his own credibility by denying the accuracy of his second written statement to law enforcement authorities. Had petitioner (1) candidly admitted his culpability, (2) acknowledged, as he told police in his second written statement, he "stamped" on Nicolas impulsively, without premeditation, and (3) expressed sincere remorse for his misconduct, Dr. Wilson's personal knowledge and professional opinions might have been elevated to the status of "material" evidence under the *Brady* standard with regard to the guilt-innocence phase of petitioner's trial, not merely at the punishment phase of petitioner's trial.

death. *See Moore v. Johnson,* 194 F.3d 586, 622 (5th Cir.1999) (holding a federal habeas court granting relief as to punishment only may not directly order the State to grant the petitioner a new punishment hearing but, instead, must grant federal habeas relief while also granting the State a reasonable period of time within which to either grant the petitioner a new trial as to punishment only or vacate petitioner's death sentence and impose a sentence of less than death). In all other respects, petitioner's first claim for relief herein is **DENIED.**

4. Petitioner is **GRANTED** a Certificate of Appealability with regard to the narrow issues (1) whether petitioner's constitutional rights under Brady were violated at *the guilt-innocence phase* of his trial by the prosecution's withholding of the favorable opinions *and* personal knowledge of Dr. Wilson (a portion of petitioner's first claim herein) and (2) whether petitioner's trial counsel rendered ineffective assistance *in connection with the punishment phase* of petitioner's capital trial by failing to interview Dr. Wilson once the prosecution rested without calling Dr. Wilson to testify (a portion of petitioner's second claim herein). In all other respects, petitioner is **DENIED** a Certificate of Appealability.

5. All other pending motions are **DISMISSED AS MOOT.**